ESTATE OF ANTHONY CARDULLA, Decesed and MARY CARDULLA, SURVIVING WIFE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Cardulla v. Commissioner
Docket No. 13097-79.
United States Tax Court
T.C. Memo 1986-307; 1986 Tax Ct. Memo LEXIS 304; 51 T.C.M. (CCH) 1511; T.C.M. (RIA) 86307; July 23, 1986. Richard J. Cardulla, for the petitioners. Ruth E. Salek, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined the following deficiencies and additions to tax in petitioners' *306 income tax for their 1973, 1974, and 1975 taxable years: Addition to Tax
Year
Deficiency
Sec. 6653(b) [1]
1973
$10,952.48
$5,476.24
1974
27,361.13
13,680.57
1975
18,130.86
9,065.43
The issues presented for our decision are: whether petitioners omitted from their 1973, 1974, and 1975 Federal income tax returns taxable income in the respective amounts of $33,213.67, $57,853.50, and $48,542.23; (2) whether any part of the underpayment of tax for petitioners' 1973, 1974, and 1975 taxable years is due to fraud; (3) whether respondent is barred by the statute of limitations from assessing tax liability for the Cardullas' 1973, 1974, and 1975 taxable years; and (4) whether Mrs. Cardulla is entitled to relief from liability under section 6013(e) for any deficiency. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The first stipulation for trial as modified by our order of July 6, 1983, and the attached exhibits are incorporated herein by this reference. Although the petition in the instant *307 case was filed on September 10, 1979, it was nearly 4 years before this case was finally brought to trial. The attorney for petitioners was persistently unwilling to engage in the stipulation process as required by Rule 91. [2] On February 3, 1981, respondent issued to petitioners Respondent's Requests for Admission; Respondent's Request for Production of Documents; and Respondent's Interrogatories to Petitioners. Petitioners responded to respondent's requests on February 23, 1981 and also issued "Petitioners' Request for Production of Documents." Petitioner's response, however, was entirely inadequate and on March 26, 1981 respondent filed a motion to compel answers to admissions or to impose sanctions. On August 11, 1981, this Court issued an order directing compliance with the discovery motions issued by the respective parties. On January 6, 1982, respondent filed with this Court a motion for summary judgment primarily because, as of that date, petitioners had failed to respond to the interrogatories or admissions as required by this Court's August 11, 1981 order. A *308 hearing was held on March 8, 1982, at which time the parties agreed that respondent would withdraw his motion for summary judgment and that petitioners would file complete answers to the interrogatories and admissions on or before April 16, 1982. As a further result of the March 1982 hearing, this Court ordered the parties to file a stipulation of facts on or before September 15, 1982. Petitioners again failed to timely respond to respondent's interrogatories and Requests for Admission. Petitioners also failed to cooperate in developing a stipulation as required by this Court's Rules of Practice and Procedure. A pretrial hearing was held before this Court on December 8, 1982, at which time the parties were again ordered to confer for as long as necessary in order to reach an agreement on a stipulation of facts. By the close of the day, the attorneys for both parties had agreed to a first stipulation for trial which was dispositive of all but four issues. On December 10, 1982, respondent sent to petitioners the first stipulation for trial reflecting the agreement of December 8, 1982. On December 20, 1982, however, the attorney for petitioners sent respondent a letter indicating *309 that he was unwilling, despite his earlier agreement, to sign the stipulation. On May 24, 1983, respondent filed pursuant to Rule 91(f)(1), a motion for order to show cause why proposed facts and evidence should not be accepted as established. This motion was heard at a pretrial conference held on June 7, 1983. As a result of this hearing, we ordered that the stipulation and accompanying documents pertaining to respondent's motion under Rule 91(f) be deemed stipulated with certain exceptions noted in our order of July 6, 1983. Petitioner Mary Cardulla (hereafter "Mary") resided at Star-Route, Box 59, Ramona, California, when she filed the petition herein. Mr. and Mrs. Cardulla timely filed their Federal income tax returns for the taxable years 1972, 1973, 1974, and 1975. They reported their taxable income on these returns in the amounts of $16,569, $13,957, $18,578, and $8,865, respectively. During each of the taxable years in issue, the Cardullas operated a retail salvage business under the name of Cardulla Sales. In 1975, Cardulla Sales was in the process of winding down its business operations. Decedent's principal place of business was located at 6560 Break of Day Road, *310 Victor, New York.The Cardullas' Federal income tax returns were filed on the cash method of accounting for the taxable years in issue. Mr. Cardulla told respondent that he reported all the income he earned and that his income was derived solely from the sale of salvaged goods and small amounts of interest from his and his wife's savings accounts. The Cardullas, however, also earned taxable income from the following sources that are in addition to those disclosed by Mr. Cardulla: (1) fees paid by Lehigh Valley Railroad and the Erie Lackawanna Railroad to remove debris from their railroad tracks after train derailments; (2) proceeds from the sale of meat during 1974; (3) rental income; and (4) dividend income. The Cardullas failed to maintain adequate books and records of their income producing activities for the 1973, 1974, and 1975 taxable years. The amounts of taxable income, deductions and other items required to be shown on the Cardullas' income tax returns for each of the taxable years in issue could not be determined from the records maintained by decedent and submitted for examination by respondent. Respondent issued a 90-day notice of deficiency to the Cardullas on June 19, 1979. *311 Respondent reconstructed the Cardullas' income by the use of the net worth and personal expenditures method. [3]
Decedent and Mary's income tax returns for the taxable years 1973, 1974, and 1975 were prepared by public accountant, Sidney Galinsky, in Rochester, New York. Mr. Galinsky based his preparation of the Cardullas' tax returns on an analysis of their bank statements, check registers, deposit slips, and the cancelled checks from their checking account. After Mr. Galinsky prepared these income tax returns, Mr. Cardulla would review the return and discuss any questionable items. The return was then verified and signed by decedent and Mrs. Cardulla. The Cardullas maintained 28 bank accounts during the years 1973, 1974, and 1975. Some of these accounts were held jointly by the Cardullas, some were held individually by either Mary Cardulla or Anthony Cardulla, Sr., and still others were held by Mr. or Mrs. Cardulla in trust for their grandchildren. In 1974, decedent received $37,000 from the sale of meat *312 to a store owner in Binghamton, New York. Mr. Cardulla told respondent's investigators that he deposited the $37,000 amount into his Marine Midland business checking account with a notation on the deposit slip indicating that the amount represented a loan. Mr. Cardulla also told his accountant, Sidney Galinsky, that the $37,000 was a loan and, accordingly, the accountant did not report the amount as income on petitioners' income tax returns for any of the years in issue. During an interview conducted during respondent's investigation, however, Mr. Cardulla told Special Agent Randy Vaughn that if the $37,000 was not reported on his return, it was due to his accountant's error. The Cardullas' income tax returns for the taxable years 1969, 1970, and 1971 were previously audited by the Internal Revenue Service. As a result of that audit, Mr. Cardulla changed the method he used to report inventory on his returns. Prior to the audit, Mr. Cardulla determined the value of his inventory by including both the amounts actually paid for inventory during the taxable year and also any accounts payable on the items purchased from the railroads that were outstanding at year end. As a result *313 of the audit that occurred in 1969, 1970, and 1971, Mr. Cardulla was advised by his accountant that because he was a cash basis taxpayer he should value his inventory at cost. The Cardullas' 1971 closing inventory value was derived from an agreement that was made with the Internal Revenue Service following the audit for the taxable years 1969 through 1971. The closing inventory amount agreed upon was used by Mr. Cardulla for opening inventory on the Cardullas' 1972 return. Decedent told respondent during an interview on August 25, 1976, that at the end of each of the taxable years in issue, he would take a physical count of all the merchandise in each of his warehouses and in the barns located at his home. Mr. Cardulla valued the inventory according to the lesser of either the price paid for each item or its fair market value. The revenue agent determined that the amounts on Mr. Cardulla's cancelled checks corresponded with the amounts reported by the Cardullas on their tax returns for each of the years in issue. The inventory values used by respondent on their net worth computation for each of the taxable years in issue were taken directly from Mary and Anthony Cardullas' 1972, *314 1973, 1974, and 1975 Federal income tax returns. Mr. Cardulla failed to inform his accountant, Mr. Galinsky, of the income producing property purchased by the Cardullas, in California, in 1973. In addition, Mr. Galinsky was never advised of the official bank checks purchased with business receipts, but deposited into the Cardullas' personal accounts.Furthermore, Mr. Cardulla failed to advise respondent's investigating agents of the assets owned by he and his wife in various states when such information was requested. Mr. Cardulla told respondent that the only assets he owned consisted of property located at 6560 Break of Day Road, Victor, New York, which decedent purchased for $7,000, a warehouse located on Maple Avenue in Victor, New York, which Anthony Cardulla built in 1974 at a cost of $41,120, a 1970 Chevrolet, and a paid up life insurance policy with Metropolitan Life Insurance Company. In addition to the assets that Mr. Cardulla disclosed to respondent, the Cardullas owned two lots in Lehigh, Florida, which were purchased for $3,410. The Cardullas also owned property on East Victor Road in Victor, New York, which they purchased for $4,500, but which was sold in 1975. *315 In 1973, the Cardullas purchased a six-unit apartment building located at 5050 West Point Loma Boulevard, San Diego, California, for $114,000. The building itself was valued at $100,000. In 1974, Mr. Cardulla and his son Anthony, Jr. had new carpeting installed in the apartment building at a cost of $5,280. The carpeting was obtained by Mr. Cardulla through an exchange of inventory with a carpet supply house. Box springs and mattresses were also purchased for the apartment building in 1973 at a cost of $880. In 1975, the Cardullas purchased 26 acres of land on Earlham Street in Ramona, California, for $76,500. In 1950, decedent built several barns in Victor, New York, at a cost of $20,000. Mr. Cardulla had at one time been in the business of raising poultry and the barns were used for this purpose. During the taxable years in issue, the barns were used for storage purposes. The Cardullas purchased a Mercedes Benz in 1975 for $9,800, and a Fiat in 1974 for $3,650, which was later given to their son. Mr. Cardulla told respondent's investigators that he did not have any loans or mortgages outstanding. However, during the 1972 taxable year, the Cardullas had an outstanding *316 note payable to Marine Midland Bank in the amount of $5,000. In addition, the Cardullas borrowed $54,500 from Michael A. Bernstein and Sharon Ruth Bernstein on April 18, 1975; $52,372.91 of this amount was still outstanding as of December 31, 1975. Furthermore, as of December 31, 1973, the Cardullas had an outstanding mortgage with Home Federal Savings and Loan on which they owed $40,596.80, $37,616.87, and $29,220.69 at the end of the 1973, 1974, and 1975 taxable years, respectively. During an interview with respondent's investigators on May 3, 1976, Mr. Cardulla said that it was his practice to deposit all business receipts into his business checking account. However, when asked about a $12,946.79 deposit to his savings account during the interview, Mr. Cardulla indicated that although the money came from the sale of merchandise, it did not constitute income because he was merely replacing money which he had withdrawn from his personal savings account for business purposes. Mr. Cardulla admitted, however, that the personal funds that he had initially used to pay business expenses were claimed as business deductions on his Federal income tax return. The $12,946.79 was not reported *317 on petitioners' tax returns for any of the taxable years in issue. Decedent told the revenue agent that the $12,946.79 was deposited to his personal savings account at Community Savings Bank so that the funds would earn interest for him. During an interview with decedent, respondent reviewed with Mr. Cardulla the Marine Midland Bank official checks purchased by Mr. Cardulla during the years in issue. This review revealed that Mr. Cardulla frequently used business receipts to purchase personal assets through the use of official bank checks. The Cardullas supplied financial information to Home Federal Savings and Loan that was used for the preparation of a personal financial statement that was signed by Mr. and Mrs. Cardulla on May 21, 1973. The Home Federal financial statement was prepared pursuant to verbal statements made by the Cardullas regarding the value of his property. The financial statement indicated assets totaling $791,067. During each of the years in issue, Mr. Cardulla was the salvage agent for the Lehigh Valley Railroad and the Erie Lackawanna Railroad. When a derailment occurred, Mr. Cardulla was contacted by the railroad. Decedent had two or three permanent *318 employees, but it was also necessary to hire additional workers at the job site. Most of the train derailments occurred in the early morning, generally during the coldest periods of the year when the switches and track would become brittle. Many derailments occurred during the holiday season because railroad employees had a tendency to run the train at higher speeds during this period in order to get home faster. Mr. Cardulla and the other employees of Cardulla Sales were responsible for salvaging as much merchandise from the train derailment as possible. Their objective was to remove the merchandise from the tracks as quickly as possible so that the railroad could resume its normal operation. Cardulla Sales was compensated by the railroads for their assistance in clearing the tracks of debris. In addition, Cardulla Sales purchased the damaged merchandise from the railroad that had been removed from the tracks. The railroad would make a record of everything that decedent and his employees removed from the scene of the derailment. The merchandise that was not destroyed or damaged was sent on to its original destination, and Mr. Cardulla removed the remaining damaged goods to *319 his warehouse where the items were stored until they could ultimately be resold. The railroad then sent Mr. Cardulla a letter describing the specific items removed by Cardulla Sales. The railroad valued the goods that were salvaged by Cardulla Sales by using the invoices prepared by the various consignees and by reviewing past claims. The amount paid by Cardulla Sales for the salvaged items was also based on the condition of those items at the time of their removal. The process by which Mr. Cardulla and the railroad negotiated a settlement concerning the value of the salvaged goods generally lasted 3 or 4 months. It was generally 3 months before the railroad was paid by Mr. Cardulla for the items purchased by Cardulla Sales for resale. Cardulla Sales paid Lehigh Valley Railroad between $20,000 and $40,000 during each of the taxable years in issue. Some of the salvaged merchandise would be sold in the Cardulla's retail store while other items would be sold wholesale. Decedent sold a variety of goods including foodstuffs, building materials, and electrical appliances. Although Cardulla Sales was in the process of winding down its business operation in 1975, the Cardullas were *320 involved in a large derailment in Leroy, New York, in the early part of 1976. Petitioner Mary Cardulla worked as a sales clerk at Cardulla Sales during all of the years in issue. Mrs. Cardulla maintained bank accounts and bonds in her own name, jointly with her husband and in trust for some of her grandchildren. She signed the income tax returns for each of the years in issue, but had no other involvement in either the preparation of these returns or her husband's business affairs. Through interviews of Mr. Cardulla and through inventories taken of petitioners' safe deposit box and safe, respondent determined that Mr. Cardulla had $13,806.40 in cash on hand. The decedent told respondent's investigators that the $13,806.40 amount remained constant from the commencement of his business until its termination in the middle of 1976. The amount of cash increased to $63,806.40 during the year 1972. These additional funds were used by the Cardullas to purchase an apartment complex in San Diego, California, in 1973. The cash on hand was used by decedent to pay the business expenses associated with a train derailment, such as the wages paid to temporary employees who insisted that they *321 be paid in cash. After each expenditure, the amount of cash expended was replaced by Mr. Cardulla. The Cardullas purchased a New York City Bond with a maturity date of July 1, 1987, a face value of $10,000 and a 5-1/4 percent annual yield. Petitioners admit that this bond was outstanding during the 1973, 1974, and 1975 taxable years. Petitioners argued at trial and on brief however, that despite their admission to the contrary, the bond in question was paid in full on January 22, 1973. Respondent has included this bond in its net worth calculations for each of the 3 years in issue. The Cardullas established certain trust accounts pursuant to the Uniform Gift to Minors Act for the benefit of the Cardullas' grandchildren. The following is a schedule of deposits for the custodial bank accounts maintained by Mary and Anthony Cardulla for their various family members during the years in issue: Acct.
Bank
Acct. No.
1972
1973
1974
1975
Total
Community Svgs.
413-0579
0 0 0
$ 500.00
$ 500.00
Community Svgs.
413-0580
0 0 0
500.00
500.00
Community Svgs.
413-0581
0 0 0
500.00
500.00
Community Svgs.
413-0582
0 0 0
500.00
500.00
Community Svgs.
413-0814
0 0 0
500.51
500.51
Community Svgs.
413-0815
0 0 0
500.51
500.51
Subtotal
0 0 0
$3,001.02
$3,001.02
Community Savings
Columbia Bnkg.
6-000558
1,200
1,000
0
1,000.00
3,200.00
Columbia Bnkg.
6-000559
1,200
1,000
0
1,000.00
3,200.00
Columbia Bnkg.
6-200818
0 0 0
3,500.00
3,500.00
Columbia Bnkg.
6-200819
0 0 0
3,500.00
3,500.00
Subtotal
$2,400
$2,000
0
$9,000.00
$13,400.00
Columbia Bnkg.
Rochester Svgs.
111-002-546
0 0 0
1,000.00
1,000.00
Rochester Svgs.
111-002-547
0 0 0
1,000.00
1,000.00
Subtotal
$ 0 0 0
$2,000.00
$2,000.00
Rochester Svgs.
TOTALS
$2,400
$2,000
0
$14,001.02
$18,401.02
*322 During the years in issue, the Cardullas maintained a savings account (#P514-71876-5) at the Marine Midland Bank. The total amount in this account during the taxable years in issue was $10,000, which reflected a deposit made in 1975. The account was maintained as security for a performance bond relating to the work that petitioners performed for the Erie Lackawanna Railroad during the years in controversy. The following table reflects the Commissioner's present position with respect to petitioners' net worth and taxable income for the taxable years in issue. Petitioners essentially agree with respondent's net worth reconstruction except for the following six exceptions: the Marine Midland account held in escrow, the bank accounts held in trust for petitioners' grandchildren, the New York City Bond, petitioners' inventory, cash on hand, and depreciation. ASSETS
12-31-72
12-31-73
12-31-74
12-31-75
1. Cash on hand
$63,806.40 $13,806.40 13,806.40 $13,806.40 CASH IN BANKS
2. Marine Midland Checking
Account #544-80639-5
3. Marine Midland Checking
Account #546-80226-5
(2,047.12)
373.45 5,558.01 1,299.08 4. Marine Midland Savings
Account #501-57032-2
650.22 687.07 715.75 1,815.93 5. Marine Midland Savings
Account #502-68289-2
4,309.85 6. Marine Midland Savings
Account #530-68166-8
5,639.73 5,938.76 6,274.51 156.90 7. Marine Midland Savings
Certificate #P514-63426-0
2,000.00 2,000.00 2,000.00 8. Marine Midland Savings
Certificate #P514-71876-5
10,000.00 9. Canandaigua Nat'l Bank
& Trust Co. Savings
Account #1-13529
229.30 239.78 251.96 264.78 10. Canandaigua Nat'l Bank
& Trust Co. Savings
Account #1-10348
671.77 703.35 739.18 776.82 11. Community Savings Bank
Account #P-1436
3,534.22 960.74 14,375.45 8,243.14 12. Community Savings Bank
7% Subordinated Note #Q467
5,000.00 5,000.00 5,000.00 5,000.00 13. Community Savings Bank
Account #413-0579
500.00 14. Community Savings Bank
Account #413-0580
500.00 15. Community Savings Bank
Account #413-0581
500.00 16. Community Savings Bank
Account #413-0582
500.00 17. Community Savings Bank
Account #413-0814
500.51 18. Community Savings Bank
Account #413-0815
500.51 19. Columbia Banking
Account #6-501214
8,160.73 20. Columbia Banking
Account #6-000008
4,958.82 696.85 1,152.20 1,722.45 21.Columbia Banking
Account #6-000558
1,221.08 2,326.88 2,454.09 44.21 22. Columbia Banking
Account #6-000559
1,221.08 2,326.88 2,454.09 44.21 23. Columbia Banking
Account #6-200818
3,706.02 24. Columbia Banking
Account #6-200819
3,706.37 25. Haven Savings & Loan
Ass'n Certificate #17-5785
26. Home Federal Savings
& Loan Ass'n of San Diego
2,692.92 2,470.53 7,073.36 Account #10-121940-0
27. Rochester Savings Bank
Account #111-002-546
1,049.86 28. Rochester Savings Bank
Account #111-002-547
1,049.86 29. Sheridan Savings & Loan
Ass'n Account #02-007-00045
472.65 1,947.15 3,559.36 30. Banco De Lordres Y.
Mexico S.A. Account
#38520229
10,000.00 31. Bank of America Account
#01790-02056
600.00 600.00 600.00 CHECKS IN TRANSIT
32. Marine Midland Bank
Official Check #0900232
6,000.00 33. Marine Midland Bank
Official Check #0900233
6,000.00 34. Marine Midland Bank
Official Check #3414632
5,000.00 35. Marine Midland Bank
Official Check #3414634
5,000.00 LOANS RECEIVABLE
36. Anthony V. Cardulla,
Jr.
5,400.00 10,100.00 5,100.00 3,300.00 37. Mary Lou Scherbyn
3,527.35 2,052.85 5,440.64 38. JoAnne Heck
39. Richard J. Cardulla
40. Douglas Lietz
500.00 500.00 41. Hyb Jossem
500.00 500.00 BUSINESS
42. Inventory
24,500.00 21,970.00 23,900.00 32,400.00 43. Equipment
77,082.23 84,282.23 84,282.23 85,574.21 SECURITIES
44. Agway Common Stock
and 6% Debenture
250.00 250.00 250.00 250.00 45. NEL Gross Fund, Inc.
519.80 531.17 544.22 548.70 46. Eastman Kodak Stock
163.25 163.25 163.25 163.25 47. U.S. Government,
Series "E" Bond
1,500.00 48. New York City Bond
10,100.60 10,100.60 10,100.60 $206,771.36 $169,744.33 $199,192.47 $227,697.17 REAL ESTATE
49. 6560 Break of Day
Road, Victor, New York
7,000.00 7,000.00 7,000.00 7,000.00 50. Barns, Victor, New York
20,000.00 20,000.00 20,000.00 20,000.00 51. Lots 4 & 5, Lehigh,
Florida
3,410.00 3,410.00 3,410.00 3,410.00 52. Maple Avenue, Victor,
New York
14,000.00 14,000.00 14,000.00 14,000.00 53. East Victor Koad,
Victor, New York
4,500.00 4,500.00 4,500.00 54. 5050 West Point Loma
Blvd., San Diego,
California
114,000.00 114,000.00 114,000.00 55. Warehouse, Maple Ave.,
Victor, New York
41,120.00 41,120.00 56. Earlham St., Ramona,
California
76,500.00 IMPROVEMENTS TO RENTAL
PROPERTY
57. Box Springs and
Mattresses
880.00 880.00 880.00 58. Carpeting
5,280.00 5,280.00 TOTAL ASSETS
$255,681.36 $333,534.33 $409,382.47 $509,887.17 LIABILITIES
59. Canandaigua Nat'l
Bank, Note Payable
60. Marine Midland Bank,
Note Payable
5,000.00 61. Home Federal Savings
& Loan Ass'n Mortgage
#151955
40,596.80 37,616.87 29,220.69 62. Michael A. & Sharon
R. Berstein Installment
Note
52,372.91 INVESTMENT IN CARDULLA SALES
63. Richard J. Cardulla
10,784.38 16,834.92 20,597.96 23,873.86 64. JoAnne Heck
1,264.00 3,064.00 5,200.00 7,000.00 65. Reserve for
Depreciation
70,525.62 80,400.14 94,055.30 109,410.33 TOTAL LIABILITIES
$ 87,574.00 $140,895.86 $157,470.13 $221,877.79 TOTAL ASSETS
$255,681.36 $333,534.33 $409,382.47 $509,887.17 TOTAL LIABILITIES
87,574.00 140,895.86 157,470.13 221,877.79 NET WORTH
$168,107.36 $192,638.47 $251,912.34 $288,009.38 PRIOR YEARS NET WORTH
168,107.36 192,638.47 251,912.34 NET WORTH INCREASE
$ 24,531.11 $ 59,273.87 $ 36,097.04 ADJUSTMENTS
ADDITIONS
66. Federal Income
Taxes Paid
9,853.75 2,703.78 1,906.00 67. State Income Taxes
Paid
3,393.13 371.00 1,400.60 68. Life Insurance
Premiums Paid
3,495.29 80.95 80.95 69. 1974 Fiat Gift to
Richard J. Cardulla
3,650.00 70. 1975 Mercedes Benz
9,800.00 71. Gifts to Scherbyns
400.00 400.00 400.00 72. Gift to Jennie
DeNicola
5,000.00 73. Gift to Anthony V.
Cardulla, Jr., East
Victor Rd., New York
4,500.00 74. Living Expenses by
Check
1,632.93 6,939.65 2,531.74 75. Cash Living Expenses
1,560.00 1,560.00 1,560.00 ELIMINATIONS
76. Federal Income Tax
Refunds
( 625.98)
( 167.68)
77. Dividend Exclusion
(NEL & AGWAY)
( 1.50)
( 1.75)
( 2.00)
78. Nontaxable New York
City Bond Interest
( 525.00)
( 525.00)
( 525.00)
CORRECTED ADJUSTED GROSS
INCOME
$ 48,713.73 $ 74,284.82 $ 57,749.33 79.Itemized Deductions
Corrected
(5,488.06)
( 2,997.32)
(3,523.10)
80. Exemptions
(1,500.00)
( 1,500.00)
(1,500.00)
CORRECTED TAXABLE IMCOME
$ 41,725.67 ($69,787.50)
$ 52,726.23)
81. Taxable Income Reported
(8,512.00)
( 11,934.00)
(4,184.00)
UNREPORTED TAXABLE INCOME
$ 33,213.67 $ 57,853.50 $ 48,542.23 *323 OPINION The first issue for decision is whether the Cardullas are liable for the deficiencies in Federal income tax for the taxable years 1973, 1974, and 1975. A presumption of correctness attaches to respondent's determination, and petitioners bear the burden of overcoming this presumption and proving his determination to be erroneous. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). In the instant case, decedent failed to maintain a complete and adequate set of books and records with regard to their income producing activities during the taxable years in issue as required by section 6001.[4] See section 1.6001-1(a), Income Tax Regs. The amounts of the Cardullas' gross income, deductions and other items required to be shown on their Federal income tax returns for each of the years in issue could not be determined from the information submitted to respondent for examination. Under such circumstances, the Commissioner is authorized by section 446 to reconstruct the taxpayer's income by applying a method that will, in his opinion, clearly *324 reflect income. Section 446(b); see Holland v. United States,348 U.S. 121, 130-132 (1954); Campbell v. Guetersloh,287 F.2d 878, 880 (5th Cir. 1961); Davis v. Commissioner,239 F.2d 187, 189 (7th Cir. 1956), affg. a Memorandum Opinion of this Court. The "net worth" method used by respondent in the instant case to reconstruct the Cardullas' income for the three years in issue had long been recognized by this Court as an acceptable method of reconstructing income. Holland v. United States,supra;Cefalu v. Commissioner,276 F.2d 122 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Davis v. Commissioner,supra;Lipsitz v. Commissioner,21 T.C. 917 (1954), affd. 220 F.2d 871 (4th Cir. 1955). *325 Petitioners allege that Revenue Agent Zingaro testified that the Cardullas did in fact maintain a set of books reflecting the transactions occurring in their business during the period in question. In this regard, petitioners argue that the existence of these books makes respondent's use of the net worth method inappropriate. [5] We disagree. Revenue Agent Zingaro was confused by petitioners' questions at trial and his answers erroneously implied that Mr. Cardulla kept a set of books and records detailing his business transactions. Later, Mr. Zingaro clarified for the Court that the "books and records" to which he referred when questioned by petitioners' attorney consisted merely of Mr. Cardulla's checking and savings account statements and various spread sheets prepared by petitioners' accountant. We were not at all mislead by Mr. Zingaro's testimony. Although many, and indeed most, of the figures *326 used by respondent to compute the Cardullas' net worth were stipulated, petitioners have made certain challenges to the accuracy of respondent's deficiency determinations. Petitioners bear the burden of establishing the necessity of any adjustments to respondent's determinations. Furthermore, should petitioners succeed in proving that certain of respondent's computations were erroneous, this will not vitiate the use of the net worth method by respondent, and the presumption of correctness will continue to attach to the remainder of his deficiency determination. Marcello v. Commissioner,380 F.2d 494, 497 (5th Cir. 1967), affg. a Memorandum Opinion of this Court; Cefalu v. Commissioner,supra at 125; Harper v. Commissioner,54 T.C. 1121, 1129 (1970). The premise underlying the net worth method of reconstructing income is that a taxpayer uses his taxable income to make both deductible and nondeductible expenditures and to purchase assets. The net worth theory is based on the proposition that if the increase in a taxpayer's net worth *327 during a specific year plus his nondeductible expenditures for that period, exceed his reported net income for the year, this excess will constitute unreported taxable income. See generally, 2 Mertens, Law of Federal Income Taxation, sec. 12.112, p. 453 (Rev. 1985). The first step in the net worth reconstruction of income is to accurately determine an opening net worth by competent evidence. After an opening net worth has been determined, respondent must attempt to ascertain the amount of any increase in net worth from year to year. The mere fact of an increase in net worth, however, is not the equivalent of taxable income. The taxpayer may have made nondeductible expenditures (i.e., for daily living expenses) which, in the absence of an appropriate modification, would result in the net worth increase being less than the taxpayer's actual taxable income for the period in question.Alternatively, the taxpayer may have acquired assets during the course of the year from income which is partially or wholly exempt from taxation (i.e., gifts, municipal bond interest, and capital gains). Once again, without the necessary adjustment, the net worth increase would be greater than the *328 actual amount of the taxpayer's taxable income. Thus, the increase in net worth for the period is first determined by comparing net worth (assets over liabilities) for the year in question with that of the prior year. [6] Then the increase in the taxpayer's net worth must be adjusted as follows: (1) Expenditures for nondeductible items are added to the increase in net worth. Typically such nondeductible expenditures include the taxpayer's personal living expenses. (2) The nondeductible portion of capital losses and those nondeductible losses sustained in the disposition of personal assets are also added to the net worth increase. A nondeductible loss would otherwise have a downward effect on the net worth increase thereby incorrectly reducing taxable income. (3) The net worth increase must be decreased by the total of any nontaxable income received during the period in question (i.e., gifts, inheritances, tax-exempt interest, etc.). Without such an adjustment, the taxpayer's net worth increase would be overstated resulting in his taxable income being artificially inflated. *329 2 Mertens, supra at sec. 12.113. [7]
The increase in net worth for a given year, as adjusted, is the taxpayer's adjusted gross income for that particular taxable year. The taxpayer's deductions and exemptions for that year are then subtracted from adjusted gross income to arrive at taxable income. To determine the actual amount of the deficiency, the taxable income amount, as determined above, is reduced by the amount of taxable income actually reported by the taxpayer on his return for the years in question. *330 2 Mertens, supra at sec. 12.113. Bank Accounts
Petitioners first attack on the Commissioner's computations is their assertion that certain of the 28 bank accounts listed on the net worth and personal expenditures statement do not belong to petitioners and, therefore, should not be included as petitioners' assets. The bank accounts at issue are of two types. The first is a Marine Midland Bank savings certificate (#P514-71876-5), which Mr. Cardulla held jointly with his son, Anthony Cardulla, Jr., and on which an assignment for a surety bond was placed. The second type of bank account consists of 12 savings accounts at Community Savings Bank, Columbia Banking, and Rochester Savings Bank. Petitioners allege that this later group of bank accounts were held in trust for the Cardullas' grandchildren and, therefore, should not be treated as assets on respondent's net worth statement. The evidence presented at trial indicates that the Marine Midland account was a certificate of deposit maintained by decedent Anthony Cardulla and his son Anthony, Jr. The source of the $10,000 used by decedent to purchase the certificate of deposit was a November 1975 withdrawal from Marine *331 Midland Savings account #530-68166-8, which was an escrow account maintained solely by decedent. Attached to the certificate of deposit is a document assigning "all moneys due or to become due" from the certificate to the Security Insurance Company of Hartford. Respondent included the certificate of deposit in petitioners' net worth because the money used to purchase it came directly from one of decedent's savings accounts. Petitioners have the burden of proof with respect to establishing that the amounts reflected in both the escrow account and the certificate of deposit were erroneously reported on the net worth and personal expenditures statement. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Petitioners, in the instant case, have failed to introduce any evidence to impugn the propriety of including these amounts as assets on the net worth statement. Furthermore, although the amounts in question appear to be related to a performance bond required by the Erie Lackawanna Railroad, the money was still in the account as of the close of the period in question. Thus, *332 although the assets in question were apparently subject to forfeiture if Mr. Cardulla failed to adequately discharge his performance obligations to the railroad, no such forfeiture occurred and the assets remained in Mr. Cardulla's account. In addition, the fact that the certificate of deposit was in the name of both Mr. Cardulla and his son Anthony, Jr. does not change the result. Petitioners failed to produce any evidence to suggest that Anthony Cardulla's rights to the certificate of deposit were in any way subordinate to or qualified by his son's interest in the account. Indeed, Anthony Cardulla, Jr. made no statement nor other allegation, during his testimony at trial, that any of the funds placed in the account were his. As discussed infra, the $10,000 actually used to purchase the certificate of deposit came directly from one of Mr. Cardulla's bank accounts. We believe that respondent was correct in including the certificate of deposit in petitioners' net worth. Petitioners also questioned the inclusion by respondent in the net worth computation of certain savings accounts at Community Savings Bank, Columbia Banking, and Rochester Savings Bank.The moneys in these *333 accounts were held by the Cardullas in custodial accounts for their grandchildren. The parties agreed that the following bank accounts were custodial accounts established with either Mary or Anthony Cardulla as custodian for their grandchildren pursuant to the New York Uniform Gifts to Minors Act: Name of Bank
Account Number
1. Community Savings
413-0579   2.Community Savings
413-0580   3. Community Savings
413-0581   4. Community Savings
413-0582   5. Community Savings
413-0814   6. Community Savings
413-0815   7. Columbia Banking
6-000558   8. Columbia Banking
6-000559   9. Columbia Banking
6-200818   10. Columbia Banking
6-200819   11. Rochester Savings
111-002-546
12. Rochester Savings
111-002-547
Respondent contends that these accounts should be included in petitioners' net worth because of the control that the Cardullas allegedly maintained over these accounts. As to certain of these accounts, Mr. Cardulla signed the signature cards so that he could presumably withdraw funds from the account. Such a withdrawal, however, would be solely in his capacity as a custodian *334 and not as the beneficial owner of the funds. We find respondent's argument to be misplaced in light of the rigid statutory guidelines established for these custodial accounts by the New York Uniform Gifts to Minors Act. A gift made pursuant to the Act is irrevocable and conveys to the minor indefeasibly vested legal title to the property in question. N.Y. Estates, Powers and Trusts Law, section 7-4.3 (McKinney 1984) (hereafter "EPTL"). The Uniform Gifts to Minors Act was enacted in New York to provide an alternative for people who wished to make gifts to their young progeny without placing the gifted property directly into the hands of the unwitting minor. The statute provides the custodian with broad powers to accumulate or expend income or principal. A transfer made pursuant to the Uniform Gifts to Minors Act qualifies the donor for the annual gift exclusion pursuant to section 2503. Furthermore, the custodianship is ignored for Federal income tax purposes. Thus, the custodian is not required to file income tax returns because the minor reports the income from the custodianship *335 property. [8] The Act provides for the mandatory distribution of the property to the minor upon the donee's attaining majority age. EPTL section 7-4.4(d) (McKinney 1984). We find that petitioners have sustained their burden of proving that respondent improperly included these custodial accounts in the Cardullas' net worth. As noted above, the parties have agreed that these bank accounts were established pursuant to the Uniform Gifts to Minors Act in New York. As such, these accounts can properly be categorized as "fiduciary" or "trust" accounts. Accordingly, the funds in these accounts do not constitute assets belonging to the Cardullas and, therefore, these funds should not be included in their opening and closing net worth for the taxable years in question. [9] We note, *336 however, that the actual deposits made to these custodial accounts should be treated as gifts in the years the deposits were made. As discussed above, a taxpayer's net worth is determined as of the end of a given taxable year. The increase in net worth is then adjusted by adding to it certain nondeductible expenditures such as the deposits, or gifts, made to these custodial accounts. Thus, the cash deposits made to these Uniform Gifts to Minors Act accounts will necessitate an upward adjustment in the net worth increase for the particular year in which the deposit was made. The deposits to these accounts will simply be listed as gifts to grandchildren under the title of "Adjustments" on petitioners' net worth and personal expenditures statement, rather than as "Cash in Banks" in the asset column. New York City Bond
Petitioners next allege that they erroneously admitted that they held a $10,000 New York City Bond during the years 1973 through 1975. Respondent argues that the Cardullas did in fact hold the bond during the years in issue and that he relied on their admission and, therefore, did not *337 present any additional evidence at trial. According to respondent, petitioners should be estopped from now withdrawing their admission. We agree with respondent. Petitioners also argue that they erred in admitting ownership of the New York City Bond because the evidence indicates that the bond was paid on January 23, 1973.The evidence that petitioners refer to consists of a copy of the bond itself having stamped on its face "Paid JAN 23, 1973." The Cardullas now contend that the stamp signifies that the amount of the bond was paid to them on January 23, 1973 and, therefore, that the bond should not appear as an asset on petitioners' net worth statement for the years in issue. Respondent argues that petitioners' interpretation of the "paid" stamp is erroneous. We agree with respondent. The face of the bond clearly shows a "trade date" (upper right hand corner) of January 16, 1973. This represents the date that the bond was ordered. According to respondent, it is common practice in the trading of securities to allow seven days for the payment of the bond purchase price. This date constitutes the "settlement date" located in the middle of the right hand side of the bond. The *338 purchaser is required to pay the broker the purchase price of the bond prior to the settlement date. The lower portion of the bond shows that the Cardullas delivered a check to Marine Midland Bank in Pittsford, New York, on January 23, 1973, and the bond was accordingly stamped as "paid" on that date. We note that the maturity date on this bond was July 1, 1987. We find respondent's description of this transaction to be quite plausible. Petitioners have failed to provide this Court with any evidence to support their assertion that the bond was redeemed in 1973. This we find unacceptable in light of their burden of proof on this issue. Rule 142(a). We note that any questions concerning this bond could readily have been addressed to Mr. John Nagurney. Mr. Nagurney was called by respondent to testify on behalf of the Marine Midland Bank regarding other checks which petitioners had not admitted to during the discovery process. His rather lengthy testimony was taken on August 2, 1983, the first day of this trial. At the close of his testimony, Mr. Cardulla stated he had no further questions of the witness, and he was excused by the Court. Inasmuch as the New York City Bond was *339 purchased through Marine Midland Bank, Mr. Nagurney could have readily described the bank's procedures regarding settlement dates and the "paid" stamp on the face of the bond. Instead, petitioners' counsel raised the question for the first time late in the second day of trial. We find petitioners' allegation that the bond was in fact paid in 1973, rather than purchased in 1973, to be totally without evidentiary support. Furthermore, petitioners forfeited their right to question the inclusion of this asset in respondent's net worth computation by admitting that they held the bond during the years in issue in Respondent's Requests for Admissions. Rule 90(e) provides in pertinent part as follows: (e) Effect of Admission: Any matter admitted under this Rule is conclusively established unless the Court on motion permits withdrawal or modification of the admission. * * * This Court has consistently held that a party has the right to rely on the responses to a request for admissions. Rule *340 90; Freedson v. Commissioner,65 T.C. 333 (1975), affd. 565 F.2d 954 (5th Cir. 1978). A copy of the bond in question was attached to Respondent's Requests for Admissions and was duly moved and accepted into evidence by this Court during the August 1983 trial of the instant case. It should be noted that this Court has long recognized that a party must admit or deny a specific request for admission based on the information and evidence at his disposal at the time he answers the request. "Obviously, as a case progresses, new evidence or further thought might require such party to raise additional legal or factual contentions." Estate of Allensworth v. Commissioner,66 T.C. 33, 40 (1976). Rule 90(e) specifically provides for the modification or withdrawal of admissions by leave of this Court. If a party requests such permission, we would at that time decide whether the request is timely and consider the consequences of allowing petitioners to change their position. In the instant case, the document in issue was attached to Respondent's *341 Requests for Admission. Furthermore, respondent brought all of the documents supporting these requests to Washington, D.C., on December 8, 1982, at which time petitioners' attorney had ample opportunity to review them in detail. Thus, with respect to the admission in issue, petitioners had all of the information and evidence in their possession at the time they admitted that they held the bond during all of the years in issue. Furthermore, petitioners never made a motion in this Court to withdraw the admission. For the reasons stated above, we refuse to grant petitioners' belated request to deny their earlier admission. Inventory
Petitioners next assert that the approach taken by respondent to value inventory for purposes of the net worth computation was improper. [10] Both petitioners and their Schedule C business Cardulla Sales, were cash basis taxpayers during the years in issue. The Cardullas' Federal income tax returns for the taxable years 1969, 1970, and 1971 were previously audited by the Internal Revenue Service. As a direct result of that particular audit, decedent altered the method that he had used to report his inventory values on his tax returns. Prior to *342 the audit, petitioners calculated the value of their inventory by including both the value of merchandise actually paid for and any accounts payable on the items purchased from the railroads that were still unpaid at year end. Following the audit for the years 1969, 1970, and 1971, Mr. Cardulla was advised by his accountant that, because he reported his income on the cash basis, he should report only the value of that inventory which had actually been paid for. *343 Mr. Cardulla explained to respondent during a 1976 interview that, during the years following the audit, he would make a physical count of all the merchandise on hand at the end of each year. The inventory, according to Mr. Cardulla, was then valued at the lesser of cost (amount paid) or fair market value. The inventory values used by respondent in his net worth computation for each of the taxable years in issue were taken directly from the Cardullas' 1972, 1973, 1974, and 1975 Federal income tax returns. The revenue agent reviewed the decedent's cancelled checks and determined that these amounts corresponded with the inventory values reported by the Cardullas. Petitioners cite Thor Power Tool Co. v. Commissioner,439 U.S. 522 (1979), for the proposition that respondent improperly required the Cardullas to "write-down" their inventory. Petitioners contend that the prior audit adjustment discussed above, requiring Mr. Cardulla to reduce his inventory by the corresponding accounts payable, is somehow offensive. Petitioners' assertion is difficult to comprehend in light of the fact that the Cardullas had always reported their income on the cash basis and the *344 prior audit merely placed petitioners' method of valuing inventory on the cash basis as well. In Thor Power Tool Co. v. Commissioner,supra, the taxpayer reduced the value of a portion of its inventory based on its estimate that some of its merchandise was no longer marketable. The merchandise in question was reduced to either "scrap value" or "spare parts" value, both of which were substantially less than fair market value. Thor Power Tool Company, however, continued to hold the items in its inventory for sale at their original fair market value prices. The taxpayer's annual reduction in inventory values was disallowed because, according to the Commissioner, there was no basis for an annual reduction in inventory value unless (1) the taxpayer actually offered the merchandise at the lower price in its ordinary course of business (i.e., a year-end sale); or (2) the merchandise was actually physically defective. This Court, the Seventh Circuit Court of Appeals, and the United States Supreme Court all agreed with the Commissioner. "In construing section 446 and its predecessors, the Court has held that *345 '[t]he Commissioner has broad powers in determining whether accounting methods used by a taxpayer clearly reflect income.'" Thor Power Tool Co. v. Commissioner,supra at 532. The method used by the taxpayer to "write-down" its inventory in Thor is quite unlike the method used by respondent to determine petitioners' inventory values for purposes of his net worth calculation. We find petitioners' reliance on Thor Power Tool to be erroneous. Respondent's discretion in changing petitioners' method of reporting inventory during the prior audit was well within his discretion because it merely placed petitioners on a system of valuing their inventory that was consistent with their cash method of reporting income. Furthermore, as respondent correctly points out, the very nature of a net worth reconstruction precludes the prior audit from having any impact on the years in issue in the instant case as the first year involved herein is 1973, a full two years after the final year of the earlier audit. As such, the year in between the audit and the first year in issue (1972) would cure any transitional inconsistencies caused by the prior audit adjustment. *346 Although not entirely evident from petitioners' brief, it appears as though the Cardullas believe that respondent should have valued their inventory on an accrual basis for purposes of the net worth computation. We disagree. As discussed above, the method utilized by respondent to value petitioners' inventory is entirely consistent with the Cardullas' cash basis method of reporting income. In Vassallo v. Commissioner,23 T.C. 656 (1955), the taxpayers who filed their tax returns on the cash basis, argued that it was improper for respondent to use a cash basis net worth reconstruction because they had inventories. In response to their objection, we said: The comparative net worth method of determining income and the sources and expenditures method, used by respondent in determining Vassallo's income, are not systems of accounting. Those methods are resorted to, as they were here, only because a taxpayer's books and records do not disclose his true income, nor is it possible to determine from such books and records what that income was. While we agree with petitioners that the respondent's reconstruction of Vassallo's income by such methods would have been more *347 exact had its actual inventories been included, the respondent, under the authority granted him in section 41 of the Code, determined such income on the cash basis -- the method which, in his opinion, most clearly reflected it. It was incumbent on the petitioners to show the amount of the inventories which they argue, if used, would more correctly reflect income. They made no such showing and we, therefore, approve the respondent's determination. [Vassallo v. Commissioner,supra at 661-662. Citations omitted.] [11]
Respondent utilized a cash basis net worth computation using those inventory values reported by petitioners on their Federal income tax returns for the years in issue. Respondent was subsequently able to determine that the amounts on petitioners' cancelled checks corresponded with the values reported by the Cardullas on their tax returns for each of the years in issue. As a result, we do not believe that the use of an accrual basis net worth statement would have more clearly reflected income than the method which respondent chose to use. [12] Furthermore, if we were *348 to allow the liability component of petitioners' net worth statement to include the trade payables corresponding to the decedent's inventory, there would of necessity be a correlating increase in the inventory value in the asset section. In effect, the upward adjustments to both the asset and liability components of petitioners' net worth computation would net out and, thus, have no effect on the overall amount of the net worth increase from year to year. Thus, the change suggested by petitioners would have no impact on the amount of the deficiencies as determined by respondent for the years in issue. [13]
*349 We conclude that respondent's treatment of petitioners' inventory for purposes of the net worth reconstruction of income was proper. The Cardullas were cash basis taxpayers and the inventory values reported on their tax returns properly reflected only that merchandise that petitioners had paid for. Furthermore, even if the method used by the Government to report inventory for purposes of the net worth computation is less precise than it might otherwise have been, it is clear that petitioners have failed to sustain their burden of proving what the actual inventory figures are or how much of the corrected inventory was encumbered by accounts payable. The burden of showing that respondent's method was not accurate, as well as providing a more accurate method of computing inventory, clearly falls on petitioners. Rule 142(a); Vasallo v. Commissioner,23 T.C. at 662. See also United States v. Cramer,447 F.2d 210, 217 (2d Cir. 1971). [14]
*350 We further believe that respondent utilized a method known to reflect income clearly. Petitioners are hardly in a position to complain when respondent has merely adopted both the income reporting method used by petitioners and the figures actually reported by the Cardullas on their 1972, 1973, 1974, and 1975 income tax returns. These values constitute effective admissions which petitioners are bound by in the absence of credible evidence to the contrary. [15]
On a related matter, petitioners allege that respondent should reduce their inventory values by the value of certain inventory bartered or traded for carpeting, which was installed in their California apartment building. We find this argument to be totally without merit. The net worth method of reconstructing a taxpayer's income is similar to a photograph in the sense that it attempts to provide a delineation of that taxpayer's assets and liabilities as of a moment in time (e.g., December 31st of any year). Holland v. United States,348 U.S. 121 (1954). The bartering of the inventory for the carpeting occurred during *351 the 1974 taxable year and its effect would, therefore, have already been reflected in the year-end inventory value for purposes of the net worth computation. Indeed, Mr. Cardulla said himself that he took a physical count of all his existing inventory at the end of each year. Thus, the exchange was presumably reflected in the 1974 inventory figure reported by Mr. Cardulla on his income tax return for that year. Furthermore, petitioners are raising this argument for the first time on brief. Respondent was not made aware of the bartering until Anthony Cardulla, Jr. testified at trial. Thus, respondent was unable to confirm that the December 31, 1974 inventory figure did not include the value of the items allegedly traded.The fact that the inventory figure used by respondent for 1974 was Mr. Cardulla's own creates a strong inference that it did not. In any event, petitioners have presented no evidence to support their assertion that the bartered inventory was erroneously reported on the net worth statement for 1974 and, therefore, we sustain respondent's determination as to this issue. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Cash on Hand
*352 Petitioners contend that respondent erred in their net worth computation by including $13,806.40 in cash on hand at the close of the 1975 taxable year. The cash was used by Mr. Cardulla to pay expenses that petitioners incurred in his business as a salvage agent for two railroads. According to petitioners, the amount was entirely depleted by the close of the 1975 taxable year when the Cardullas' business was in the process of winding down. The evidence in the record, however, suggests otherwise. We find there to be a substantial amount of evidence to refute petitioners' assertion that the $13,806.40 in cash on hand was depleted as of December 31, 1975: (1) the Cardulla's Schedule C inventory, as reported by them on their 1975 tax return, indicates an increase from the previous taxable year which is clearly not indicative of a business in the process of winding down; (2) Exhibit AW consists of a notice of auction which sets as an auction date August 28, 1976, and not the close of 1975; (3) petitioners' 1976 tax return still evidences substantial gross receipts and cost of goods sold for the 1976 taxable year. Indeed, the revenue agent and the special agent both visited the Cardulla's *353 place of business in the later part of 1975 and early 1976 and found it to be very much an ongoing business; (4) petitioners' son Anthony Cardulla, Jr. testified that his father's business was involved in salvaging a large train derailment in Leroy, New York in early 1976; (5) finally, Mr. Cardulla himself told respondent's investigators that the $13,806.40 in cash on hand remained fairly constant until his business terminated its operations in the middle of 1976. We believe that the Commissioner correctly reported petitioners' cash on hand on the net worth statement and we sustain respondent's determination on this issue. Opening Net Worth
Petitioners argue that because respondent refused to include accounts payable when calculating inventory, an accurate opening net worth could not be established. We find these allegations to be without merit. The first step taken under the net worth method is to accurately and clearly determine an opening net worth by competent evidence. According to the Supreme Court: [A]n essential condition in [net worth cases] is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which *354 to calculate future increases in the taxpayer's assets. The importance of accuracy in this figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset. * * * [Holland v. United States,348 U.S. 121, 132 (1954).] After careful consideration of the record as a whole, we are convinced that, with respect to the taxable years in issue, respondent has satisfied this "essential condition." As discussed above, petitioners' argument that respondent erroneously valued the Cardulla's inventory for purposes of the net worth computation is entirely unfounded. As discussed above, the exclusion of accounts payable from the inventory values reported on the net worth statement was entirely compatible with petitioners' cash method of reporting income. Furthermore, the inventory values used by respondent were those actually reported by petitioners on their tax returns for the years in issue. We further disagree with petitioners' contention that respondent's purported failure to procure the railroads' records of Mr. Cardulla's accounts payable precluded an accurate opening net worth. *355 In Holland v. United States,supra, the Supreme Court required the Government to "track down relevant leads furnished by the taxpayer -- leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence." Holland v. United States,supra at 135-136. Since the only inventory included in the asset column of the net worth reconstruction was that inventory already paid for by petitioners, the existence of accounts payable related to merchandise purchased from the railroads would have no effect on the computation. Indeed, as discussed above, any additional liability amount, in the form of accounts payable to the railroads, would necessitate a corresponding increase in the inventory asset line on petitioners' net worth statement. The two adjustments would effectively offset one another and the "lead" which respondent allegedly failed to investigate would not have the effect of establishing petitioners' position. See note 12, supra.
A net worth reconstruction of income is a very protracted, and exhaustive procedure involving a great deal of the Government's time and resources. It is, therefore, not surprising *356 that the Supreme Court would limit the leads which respondent is required to investigate to those that would actually have the effect of establishing petitioners' position.In the instant case, respondent methodically and thoroughly reviewed all of petitioners' bank records, canceled checks, surrogate court records, and real estate holdings in three different states. Numerous witnesses were contacted and interviewed. Every lead which would have shed light on petitioners' income or expenses was investigated. Instead of reporting their income accurately as required by law, petitioners have erected hurdles and established obstacles to thwart respondent's efforts to properly compute their tax liability. We believe that the record as a whole establishes that the Commissioner did establish, with reasonable certainty, an opening net worth. We, therefore, find in favor of respondent on this issue. [16]
*357 Depreciation
Petitioners argue on brief that respondent did not allow for an adequate depreciation allowance on their California apartment complex, and that respondent erroneously disallowed a depreciation allowance on a 1975 Mercedes Benz owned by petitioners. Petitioners contend that considering the location of the apartment building and its construction, a useful life of 15 years and a double declining method of depreciation should have been used. We disagree. The taxpayer bears the burden of proving their entitlement to claimed deductions. Deputy v. DuPont,308 U.S. 488 (1940); New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent allowed petitioners 7/12's of the normal straight line depreciation allowance because the apartment complex was purchased in May of 1973. We note that generally the taxpayer can elect a method of depreciation on his tax return. In the instant case, however, petitioners failed to report the rental income from the California apartment building and did not claim any depreciation allowance whatsoever. Petitioners' unsupported *358 assertions that a more appropriate method of depreciation should have been adopted by respondent for purposes of the net worth computation are not sufficient to satisfy their burden of proving respondent's determination to be erroneous. Marcello v. Commissioner,380 F.2d 494, 497 (5th Cir. 1967), affg. a Memorandum Opinion of this Court; Cefalu v. Commissioner,276 F.2d 122, 125 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121, 1129 (1970). We therefore find for respondent on this issue. Petitioners' son Anthony Cardulla, Jr. testified that his father used their Mercedes Benz in 1975 to travel to and from the various train derailments because the car used diesel fuel and was, therefore, easier to refuel late at night. Although it is clear that the car was used in part for business purposes, petitioners failed to provide evidence as to the exact extent that the car was used for non-business purposes. Resolving these uncertainties against petitioners, whose inexactitude is of their own making, we hold that petitioners are entitled to deduct only 50 percent of the otherwise allowable *359 depreciation deduction. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Petitioners' will qualify for a depreciation allowance for purposes of the net worth computation only to this extent. Addition to Tax -- Fraud
The next issue for decision is whether Mr. Cardulla is liable for the addition to tax for fraud for the three taxable years in issue. Section 6653(b) provides, in part, that "[i]f any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." Thus, the addition to tax under section 6653(b) presumes the existence of an "underpayment." [17] In the absence of such an underpayment, there is nothing upon which the fraud addition to tax would attach. Jenkins v. United States,313 F.2d 624, 627 (5th Cir. 1963). [18] Therefore, affirmative proof of an underpayment is a necessary element of the Commissioner's burden of proof. To prove an underpayment, respondent is not required to establish the precise amount of the deficiency *360 determined by him. However, the Commissioner cannot satisfy his burden by relying solely on petitioners' failure to discharge their burden of proving error in his determination of the deficiency. Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. 356, 370 (1958). Pursuant to the terms of section 6653(b), the fraud addition to tax attaches to the entire underpayment even though only a portion of it is actually attributable to the fraud. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Breman v. Commissioner,66 T.C. 61 (1976); Stewart v. Commissioner,66 T.C. 54 (1976). Respondent determined the underpayment in the *361 instant case by using the net worth method of reconstructing petitioners' income. We believe that the Commissioner's net worth analysis is sufficient to sustain his burden of proof as to the existence of an underpayment. The net worth method is an acceptable mechanism for testing the accurateness of the deficiency, but its use requires "the exercise of great care and restraint" on the part of respondent. Holland v. United States,348 U.S. at 129. As discussed above, the Supreme Court in Holland held that in order for the Commissioner to validate his assertion that increases in net worth are due to unreported taxable income, respondent must establish with reasonable certainty, an opening net worth and he must establish that the annual increases in net worth emanated from taxable sources of income: Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient. * * * [Holland v. United States,supra at 137-138.] The Supreme Court subsequently held in United States v. Massei,355 U.S. 595 (1958), *362 that such proof of a likely source of the net worth increase was not mandatory and that negating all possible sources of nontaxable income would be sufficient. The Holland and Massei decisions, therefore, impose the requirement that the Government prove a likely source of taxable income, or, conduct an investigation of leads reasonably susceptible of being checked which, if true, would establish petitioner's innocence of fraud. [19]
Respondent's determination of petitioners' net worth in the instant case was predicated on certain information obtained by respondent's agents during the course of their investigation. Many interviews were conducted with petitioners and numerous other persons were contacted to enable respondent to substantiate the date that was gathered. Respondent provided this Court with detailed documentation to corroborate each item that was included on the Government's net worth statement. Indeed, only six items on the net worth statement were still in contention when the instant case went to trial. As discussed above, all of the contested items, with the exception of the custodial *363 accounts established pursuant to the Uniform Gifts to Minors Act and the depreciation allowance relating to petitioner's Mercedes Benz, were resolved in respondent's favor. We believe that respondent has reasonably established petitioners' opening net worth as well as the increases in their net worth over the period in question. Respondent must, however, also establish either that a likely source of unreported income existed or negate the existence of all nontaxable sources of income. We believe that respondent has conclusively negated all possible nontaxable sources of income by verifying all of petitioners' claimed inheritances, loans from children, and cash on hand. Indeed, the instant case is a somewhat anomalous net worth case because petitioners were attributed with $63,806.40 in cash on hand for purposes of the opening net worth. This amount was diminished to $13,806.40 by the close of the computation period, thereby providing petitioners with the use of $50,000, which presumably had been accumulated during prior years. Respondent also gave the Cardullas credit for loans that Mr. Cardulla's business received from Richard J. Cardulla and JoAnne Heck. Respondent also verified *364 that petitioners did not receive any inheritance from the estate of Mrs. Cardulla's mother until 1976. The record clearly indicates that the Commissioner conducted a thorough investigation of leads enabling him to accurately negate the existence of all nontaxable sources of income. All of the information given to respondent by petitioners was painstakingly corroborated through third party interviews and through the detailed documentation compiled by respondent during the course of his investigation. The parties have stipulated that during the taxable years in question, petitioners derived taxable income from sources which included (a) fees from the Lehigh Valley Railroad and the Erie Lackawanna Railroad to clean their tracks following train derailments, and (b) receipts from the resale of those items salvaged during the clean up of these train derailments. The grossly deficient records maintained by petitioners could not be used by respondent to verify the extent to which the receipts from these sources were not reported as income. We believe, however, that the record creates a very strong inference that the gross receipts from Mr. Cardulla's salvage and sales operations represented *365 the primary source of petitioners' unreported income. Thus, although not required to do so, we find that, in addition to negating all possible sources of nontaxable income, respondent has established the likely source of petitioners' unreported income for the period in question. We, therefore, conclude that the Holland standards have been complied with in the instant case, and that the Commissioner's net worth analysis constitutes a sufficient basis on which to sustain his burden of proving, by clear and convincing evidence, the existence of an underpayment for each of the years in issue. We must next determine whether such underpayment of tax for each year was due to fraud within the meaning of section 6653(b). To establish fraud, the Commissioner must show that the taxpayer intended to evade taxes which he knew or believed were owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); *366 Acker v. Commissioner,26 T.C. 107, 111-112 (1956). The presence or absence of fraud is a factual question that must be determined by examining the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). However, because direct proof of the taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,supra at 200; Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. at 105-106. The evidence in the instant case convincingly establishes that Mr. Cardulla fraudulently underpaid his taxes during each of the years in issue. [20] Petitioners failed to maintain books and records during the taxable years in issue.Taxpayers are under a duty to keep adequate books and records. *367 Section 6001; section 1.6001-1, Income Tax Regs. Although respondent was successful in obtaining copies of Mr. Cardulla's bank records, such records are an entirely inadequate means of recording petitioners' actual income, sales, and expenses. Mr. Cardulla's failure to maintain books and records in and of itself constitutes a significant indicia of fraud. Harper v. Commissioner,54 T.C. 1121, 1141 (1970); Otsuki v. Commissioner,supra at 111. Petitioners claim that their failure to maintain adequate books and records was due to a lack of knowledge on their part. This assertion, however, is strongly controverted by the facts in evidence. Mr. Cardulla successfully operated a business which afforded his family with a substantial income. In addition, he was able to verbally provide his accountant with enough information to construct a financial statement for Home Savings and Loan. This financial statement accurately set forth, in detail, petitioners' *368 net worth as of that time and, in fact, is very similar to the net worth statement prepared by respondent for the instant case. The decedent's business expertise and his understanding of the value of his assets clearly demonstrate that he was well informed and was quite capable of keeping adequate books and records from which the Cardullas' true income could have been readily ascertained. Additional evidence of fraud is found in the Cardullas' failure to report $37,000 in business receipts received by Mr. Cardulla from the sale of meat to a store owner in Binghamton, New York in 1974. In addition, Mr. Cardulla told respondent's investigators during a 1976 interview that it was his practice to deposit all business receipts into his business checking account. When asked about a certain $12,946.79 amount deposited into petitioners' personal savings account on November 9, 1974, however, Mr. Cardulla indicated that although the money came from the sale of merchandise, it did not constitute taxable income because he was merely replacing funds that he had withdrawn from his personal savings account for business purposes. Mr. Cardulla admitted, however, that the personal funds that he *369 had initially used to pay business expenses were claimed as deductions on his Federal income tax return. The decedent told respondent's investigators that the $12,946.79 was deposited into his personal savings account at Community Savings Bank because he wanted the funds to earn interest for him. In total, petitioners failed to report $33,213.67 in 1973; $57,853.50 in 1974; and $48,542.23 in 1975 in taxable income. [21] A pattern of consistent and substantial underreporting of income for a number of years is further indicia of Mr. Cardulla's fraudulent intent to evade taxes, particularly when accompanied by other circumstances evidencing an intent to conceal. Holland v. United States,348 U.S. at 139; Lollis v. Commissioner,595 F.2d 1189, 1191 (9th Cir. 1979), affg. a Memorandum Opinion of this Court; Furnish v. Commissioner,262 F.2d 727, 729 (9th Cir. 1958); Baumgardner v. Commissioner,251 F.2d 311, 322 (9th Cir. 1957); Kurnick v. Commissioner,232 F.2d 678, 681 (6th Cir. 1956). We note that the understatement in the instant case is in excess of three times that which petitioners reported *370 as taxable income during the years in issue. During the taxable years in issue, the Cardullas maintained 28 bank accounts, some of which were held in the names of various family members. In 1975, the decedent and Mrs. Cardulla deposited $14,001.02 into bank accounts held by them in custodial accounts. Thus, the Cardullas deposited more than one-third of their unreported income in taxable year 1975 into these accounts, and close to twice the amount of taxable income reported by the Cardullas on their income tax return. This gross disparity of reporting only $8,865 on their 1975 return, while depositing $14,001.02 into various trust accounts, indicates that Mr. Cardulla was aware that his income was substantially greater than that which he was reporting, and that these deposits were an attempt to conceal his unreported income. Such concealment is clearly indicative of *371 fraud. [22] In addition, the Cardullas purchased a Mercedes Benz in 1975 at a cost of $9,800, put a $22,000 down payment on a home in 1975, and purchased a New York City Bond in 1973 at a cost of approximately $10,000. These major expenditures contrast sharply with the amount of taxable income reported by the Cardullas for the years in question and suggest an awareness on the part of decedent that he and his wife's income was much greater than that which they reported. During the course of the Government's investigation, the decedent made several misleading or false statements to respondent's agents. In 1974, Mr. Cardulla received $37,000 from the sale of meat to a store owner in Binghamton, New York.Mr. Cardulla told respondent's investigators that he deposited the $37,000 amount into his Marine Midland business checking account with a notation on the deposit slip that the amount constituted a loan. Mr. Cardulla also told his accountant that the $37,000 represented a loan and, accordingly, the amount was not included by the accountant on the Cardullas' *372 1974 Federal income tax return. During respondent's subsequent investigation, however, the decedent told Special Agent Randy Vaughn that if the $37,000 was not reported on his return it was due to his accountant's error. During a May 3, 1976 interview, Mr. Cardulla stated that the only assets that he owned consisted of his 1970 automobile, some NEL funds, two pieces of property in Victor, New York, and a paid-up life insurance policy. Respondent's investigators subsequently determined, however, that at the time Mr. Cardulla made this statement he also owned property in Florida, a Mercedes Benz, and both a ranch and an apartment building in California. Such false and misleading statements constitute further evidence of the decedent's fraudulent intent. Estate of Mazzoni v. Commissioner,451 F.2d 197, 202 (3d Cir. 1971); Grosshandler v. Commissioner,75 T.C. 1, 20 (1980); Sunbrock v. Commissioner,48 T.C. 55, 66 (1967). Petitioners made several arguments in support of their contention that respondent has failed to meet his burden of proving that the underpayment of tax for the 1973, 1974, and 1975 taxable years was due to *373 fraud. Petitioners allege that because the inconsistent statements made by Mr. Cardulla were made to respondent's agents during the investigation instead of at the time of the filing of the tax returns for the years in issue, they may not be used to infer decedent's fraudulent intent. While it is true that respondent must show that Mr. Cardulla intended to evade his tax liability at the time he filed his returns, respondent has not relied solely on Mr. Cardulla's inconsistent statements to establish fraudulent intent. Rather, respondent has conclusively proven that the decedent possessed the requisite knowledge at the time he filed his tax returns to know that he was underreporting his taxable income by substantial amounts. Indeed, Mr. Cardulla understated his income by more than three times the amount reported. These substantial understatements occurred during years when he and Mrs. Cardulla made substantial deposits to their 28 bank accounts, purchased a 26 acre ranch, an eight unit apartment building, a $10,000 New York City Bond, and a Mercedes Benz automobile. Petitioners assert that because respondent has failed to show that petitioners' underreported their interest income *374 from their various bank accounts, no fraudulent intent can be found. As respondent points out, however, and we agree, the net worth method of reconstructing income does not allege specific underreporting such as interest from a particular savings account. Instead, the net worth method proceeds on the premise that if the increase in a taxpayer's net worth during a particular year, plus all nondeductible expenditures during that year exceed reported net income for the year, the excess constitutes unreported income. Holland v. United States,348 U.S. 121 (1954). Thus, respondent's assertion of the addition to tax for fraud was not in any specific way premised on petitioners' failure to report interest income. Petitioners also argue that their failure to claim a deduction for the depreciation and expenses associated with their apartment complex in California implies that the Cardullas' failure to report the rental income from this property or to admit to respondent that they actually owned the building was not due to fraud. We disagree. The fact that the "losses" from this property exceeded the income produced over the same period is not determinative. Mr. Cardulla's *375 failure to report the deductions associated with this property is in and of itself an indicia of fraud because it effectively veiled not only the additional income from the rental receipts produced by the property, but also the fact that petitioners' salvage business was generating sufficient income to allow the Cardullas to purchase an eight unit apartment building. This is especially true in light of the fact that Mr. Cardulla failed to inform his accountant, who actually prepared petitioners' tax returns during the period in issue, that he had purchased this income producing property. Petitioners next allege that the decedent's training and education was so minimal and his schedule so busy, that he could not have intended to evade his tax liabilities. The evidence, however, paints quite a different picture. If all of Mr. Cardulla's business receipts were deposited into his business checking account, his accountant would have been able to easily and correctly calculate petitioners' taxable income. This simple procedure certainly would not have interfered with Mr. Cardulla's busy schedule. Furthermore, petitioner was able to find the time to invest in new rental property, fill *376 out financial statements, and purchase a municipal bond during the same period that he was "too busy" to properly account for his income. For the reasons that follow, we do not believe that petitioners' "busyness" should preclude us from finding fraud in the instant case. [23]
The facts conclusively show that the decedent, despite his limited formal education, was an intelligent and resourceful individual. Indeed, he successfully operated two different types of businesses, first a turkey farm, and later a railroad salvage business. He was canny enough to advise his accountant that certain receipts from his business constituted a loan so that the amount would not be reported as taxable income. He purchased real estate in three different states and invested his money in a variety of stocks and bonds. Furthermore, Mr. Cardulla was able to provide his accountant with enough information to develop a financial statement for a savings and loan institution. Mr. Cardulla's ability to successfully manage both his vocation and his investments indicate that he fully understood his business and financial circumstances. *377 The absence of a formal education is often due to diminished opportunity rather than a lack of intelligence. Mr. Cardulla was an astute and enterprising individual who applied his abilities successfully. We believe that he was fully aware that the amounts reported on his Federal income tax returns did not truly reflect the income he was generating during the years in issue. In Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), the taxpayer argued that because his limited formal education did not extend beyond the fifth grade, his understatements were due to ignorance rather than fraud. The court rejected this argument. We assume that common sense can be the possession of the unsophisticated, the unschooled, and the unlettered. [Petitioner], though not privileged to have the other ingredients, was in possession of common sense. He must have, by the exercise of common sense, known that the figures used in his tax return were serious understatements of his obligations to his government. Innocent falsity is generally improbable; here it is impossible. [Webb v. Commissioner,supra at 380. Emphasis added.] [24]
*378 Petitioners next assert that respondent failed to produce sufficient evidence to support his claim that in 1974 the decedent received $37,000 in business receipts which he failed to report. We disagree. Mr. Cardulla alleges that he failed to report the $37,000 as taxable income because the money was used to repay certain amounts previously taken from his personal savings and loaned to the decedent's business prior to January 1973. Petitioners contend that the $37,000 was a de facto return of capital and, therefore, was nontaxable. Petitioners, however, have no provided this Court with any evidence to support this assertion. Indeed, respondent's investigator testified that the expenses associated with the $37,000 business receipt had previously been deducted by petitioners. Furthermore, although petitioners note on brief several occasions on which Mr. Cardulla claims to have transferred money from his personal savings accounts to pay business expenses, there is nothing to indicate that he did not also deduct these business expenses as they were incurred. [25]
*379 Based on the record as a whole, it is clear that petitioners' underpayment of tax for each of the years in issue was attributable to Mr. Cardulla's fraudulent intent to evade tax. We will, therefore, sustain respondent's imposition of the addition to tax for fraud as to Mr. Cardulla for all of the years in issue. Statute of Limitations
Section 6501(c)(1) provides that "[i]n the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time." Thus, our determination that the Cardullas' joint income tax returns for their 1973, 1974 and 1975 taxable years were fraudulent negates petitioners' assertion that the statute of limitations bars assessment of the deficiencies and additions to tax herein. Innocent Spouse Provisions
We deal next with whether Mrs. Cardulla qualifies for relief from liability under the innocent spouse provision found in section 6013(e). According to respondent, section 6013(e) is not applicable to relieve Mrs. Cardulla of joint and several liability for the deficiencies and the interest resulting from *380 petitioners' underreporting of taxable income. [26]
*381 Petitioners have the burden of proving that all four of the statutory prerequisites for relief pursuant to section 6013(e) have been satisfied. Rule 142(a); Ratana v. Commissioner,662 F.2d 220, 224 (4th Cir. 1981), affd. in part and revg. in part a Memorandum Opinion of this Court; Sonnenborn v. Commissioner,57 T.C. 373, 380-381 (1971).The first requirement of section 6013(e) is that a joint return must be made for each of the taxable years in issue. Section 6013(e)(1)(A). In the instant case, the parties both agree that petitioners filed joint Federal income tax returns in all three of the years in question. Respondent contends, however, that petitioners have failed to satisfy the remaining requirements of section 6013(e). In order to be relieved of liability, there must be a "substantial understatement of tax attributable to grossly erroneous items of one spouse." Section 6013(e)(1)(B). [27]Section 6013(e)(2) defines the term "grossly erroneous items" to mean, with respect to any spouse "any item of gross income attributable to such spouse *382 which is omitted from gross income." Based on the record as a whole, we are satisfied that Mr. Cardulla had exclusive control over Cardulla Sales, which was the primary source of the unreported income in the instant case. Accordingly, we conclude that because the income omitted from the Cardullas' tax returns was attributable to the decedent and because we find that the omitted amount constitutes a "substantial understatement," petitioners have satisfied the requirements of section 6013(e)(1)(B). Petitioners must next satisfy the third element of section 6013(e) which requires that the spouse seeking relief under this provision establish that "in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement." Section 6013(e)(1)(C). Although Mrs. Cardulla worked in the retail store for Cardulla Sales during *383 the years in issue, we do not believe that she had any actual knowledge of these substantial underpayments. We note that such knowledge may be imputed if a person possessing Mrs. Cardulla's experience and temperament would have known of the omissions. In order for petitioners to satisfy Mrs. Cardulla's burden of proof with respect to whether she had reason to know of the omitted income, the Cardullas "must establish that a reasonably prudent taxpayer, with her knowledge of the family finances, would have no reason to know of the omission." Estate of Jackson v. Commissioner,72 T.C. 356, 361 (1979). For the reasons stated below, we do not believe that Mrs. Cardulla had reason to know that there was a substantial understatement for each of the years in issue. In determining whether a spouse had reason to know of an understatement, this Court views as significant that spouse's degree of participation in business affairs or bookkeeping. Quinn v. Commissioner,62 T.C. 223 (1974), affd. 524 F.2d 617 (7th Cir. 1975). Mrs. Cardulla testified that Mr. Cardulla did not involve her in his business affairs. Respondent asserts that because *384 Mrs. Cardulla was effectively responsible for the day-to-day operation of the Cardulla Sales retail store, she would a fortiori have been aware that their income had been understated for each of the years in issue. We disagree. Although Mrs. Cardulla sold merchandise in the Cardulla Sales retail store, we do not believe that her very limited involvement (e.g., sales clerk) in her husband's business made her at all aware that Mr. Cardulla was underreporting their income during the years in issue. We also note that Mrs. Cardulla did not participate in any way in her husband's bookkeeping. Furthermore, Mrs. Cardulla's standard of living during this period did not increase in such a way that she would have been effectively on notice that the income earned by her husband was greatly in excess of that which the decedent reported on their Federal income tax returns. Additionally, none of Mr. Cardulla's expenditures during the period in question were sufficiently lavish such that they would have caused Mrs. Cardulla to be aware of these understatements. Mysse v. Commissioner,57 T.C. 680, 697-699 (1972). Mrs. Cardulla totally relied on her husband to handle the family *385 finances. Mrs. Cardulla had no accounting or bookkeeping experience and she logically, although mistakenly, presumed that her husband had properly completed their income tax returns. We found Mrs. Cardulla to be a candid and honest witness and we believed her testimony on this issue. Accordingly, we conclude from our examination of the evidence presented that the facts available to Mrs. Cardulla by virtue of her perfunctory participation in her husband's business are insufficient to provide the "reasonably prudent taxpayer" with reason to know of the omitted income. See Sanders v. United States,509 F.2d 162, 167-170 (5th Cir. 1975); cf. Adams v. Commissioner,60 T.C. 300, 303 (1973). Compare Sonnenborn v. Commissioner,57 T.C. at 382. Having determined that Mrs. Cardulla neither knew nor reasonably should have known of the substantial understatements of tax for the taxable years at issue, we must next determine whether, taking all of the facts into consideration, "it is inequitable to hold [Mrs. Cardulla] liable for the deficiency in tax for such taxable year." Section 6013(e)(1)(D). Although no longer a specific requirement *386 of section 6013(e)(1), whether Mrs. Cardulla benefited from the substantial understatements of income is a factor to be considered in making this determination. See H. Rept. 98-432 (Part 2) 1501, 1502 (March 5, 1984). [28]
We conclude, for the reasons that follow, that it would be inequitable to impose liability upon Mrs. Cardulla. The term "inequitable" is defined under section 1.6013-5(b), Income Tax Regs., as follows: [29]
Whether it is inequitable to hold a person liable for the deficiency in tax * * * is to be determined on the basis of all the facts and circumstances. In making such a determination a factor to be considered is whether the person seeking relief significantly benefited, directly or indirectly, from the items omitted from gross income. However, normal support is not a significant "benefit" *387 for purposes of this determination. * * * [Emphasis added.] Respondent contends that Mrs. Cardulla received significant benefits from the income omitted from the Cardullas' 1973, 1974, and 1975 tax returns. We disagree. Although some of petitioners' bank accounts were in Mrs. Cardulla's name, and certain other assets, including the New York City bond, the California ranch and the apartment building were held jointly by she and her husband, we do not believe that Mrs. Cardulla significantly benefited from her ownership interest in these assets. Indeed, we believe that the benefits received by Mrs. Cardulla as a result of the unreported income were in the nature of ordinary family support, which is not a sufficient basis to support a finding of significant benefit. Terzian v. Commissioner,72 T.C. 1164, 1172, 1173 (1979); Mysse v. Commissioner,supra at 698, 699. *388 The testimony given in the instant case by Mrs. Cardulla and others paints a rather austere picture of Mrs. Cardulla's life as an uneducated, hard working person who spent seven days a week laboring in her husband's retail store. Furthermore, the recent amendments in section 6013(e) dictate that a more liberal interpretation be given to the innocent spouse provisions. See H. Rept. 98-432 (Part 2) supra at 1503. In light of these statutory changes, we do not believe that the incidental benefits enjoyed by Mrs. Cardulla are sufficient to make it equitable to impose liability in the instant case.We, therefore, conclude that Mrs. Cardulla has sustained her burden of proving herself entitled to the benefits afforded to an innocent spouse pursuant to section 6013(e). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. Unless otherwise indicated, all rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Respondent concedes that petitioner Mary Cardulla is not liable for the addition to tax pursuant to sec. 6653(b)↩ for fraud for any of the taxable years in issue.
4. Sec. 6001 provides in pertinent part as follows: Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe. * * *↩
5. It should be noted that, despite petitioners' admonitions to the contrary, the use of the net worth method is not restricted to use in cases in which the taxpayer does not maintain any books and records. Holland v. United States,348 U.S. 121, 131↩ (1954).
6. The net worth method is not a computation based on the fair market value of assets, but instead is made in terms of the cost basis↩ of the underlying assets. This is due to the fact that regardless of the method used to calculate income, fluctuations in the value of an asset are not taken into a taxpayer's income stream until realized. 2 Mertens, Law of Federal Income Taxation, sec. 12.113, p. 463 (Rev. 1985). 7. Net operating loss carryovers and capital loss deductions also have the effect of reducing the net worth increase to arrive at adjusted taxable income.↩
8. If, however, the income from the custodianship property is used for the child's support, that income is reportable by the person having the legal obligation of support. Rev. Rul. 56-484, 1956-2 C.B. 23; Rev. Rul. 59-357, 1959-2 C.B. 212; Rev. Rul. 70-348, 1970-2 C.B. 193↩.
9. See Peppers v. Commissioner,T.C. Memo. 1981-728↩.
10. We note that petitioners also make the argument that respondent erroneously failed to account for transportation and storage expenses in determining inventory values. Petitioners' assertion in this regard is unfounded. Clearly, any out-of-pocket expenditures associated with transporting or warehousing the inventory items would have resulted in a reduction in the specific asset line that was diminished by the expenditure (e.g., "cash on hand"). Furthermore, respondent allowed for a reduction in the net worth increase to reflect petitioners' itemized deductions. Presumably, such business expenses would have been reflected as itemized Schedule C deductions. Petitioners have not presented this Court with any evidence as to the precise amount of expenses associated with the transportation and storage of inventory, nor did petitioners establish that such expenses were not already properly accounted for on the net worth statement.↩
11. See Kofmehl v. Commissioner,T.C. Memo. 1978-439↩.
12. We also note that even if petitioners had reported their income on the accrual basis, respondent would not be precluded from reporting the Cardulla's inventory values on the cash basis for purposes of the net worth computation. The bellweather case in this are is Holland v. United States,348 U.S. 121 (1954), wherein the taxpayers argued that the net worth method could not be used because it was a method of accounting different from that which they had been using. The Court stated therein: The provision that the "net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer," refers to methods such as the cash receipts or the accrual method, which allocate income and expenses between years. The net worth technique, as used in this case, is not a method of accounting different from the one employed by defendants. It is not a method of accounting at all, except insofar as it calls upon taxpayers to account for their unexplained income. * * * [Holland v. United States,supra↩ at 131.] 13. We note that if, following the purchase of a particular item of inventory, its fair market value fell below its "cost" before it was sold and before the corresponding account payable was paid, the adjustments made to the liability and asset columns of petitioners' net worth statement would not exactly offset one another. We doubt, however, that this would have occurred during the years in issue in light of the fact that generally, petitioners' accounts payable were paid within approximately 3 months of the purchase of the corresponding item of inventory.↩
14. The only evidence relating to petitioners' outstanding trade payables was the testimony given by Alfred Wago, Freight Claims Manager for the Lehigh Valley Railroad. Mr. Wago testified that it was generally three months before the railroad was paid by Mr. Cardulla for the merchandise purchased by Cardulla Sales for resale. According to Mr. Wago, Cardulla Sales paid Lehigh Valley Railroad between $20,000 and $40,000 during each of the taxable years in issue. Petitioners did attempt to show that train derailments, and therefore payments to the railroads, fluctuated during the year (e.g., more during the winter months). Petitioners, however, made no showing that there was any substantial fluctuations from year to year.↩
15. See Estate of Laity v. Commissioner,T.C. Memo. 1955-176↩.
16. Petitioners also argued that respondent's failure to determine their accounts payable is particularly offensive because, according to petitioners, respondent knew of their existence through a prior audit. In addition, petitioners assert that inasmuch as the account payable records were lost or destroyed during the Federal consolidation of the railroads, respondent, also a Federal agency, should have taken action to preserve petitioners' defense.In light of our discussion above, we find both of these allegations to be totally without merit. We further note that petitioners have presented no evidence to sustain their burden of proving respondent's opening net worth to be erroneous. Rule 142(a); Welch v. Helvering,290 U.S. 111↩ (1933).
17. The term "underpayment" is defined in sec. 6653(c)↩ in essentially the same manner as a "deficiency" to mean the amount by which the tax imposed exceeds the amount of tax shown by the taxpayer on his return. Sec. 6211.
18. See also Compton v. Commissioner,T.C. Memo. 1983-642↩.
19. See Kattar v. Commissioner,T.C. Memo. 1984-387↩.
20. Respondent concedes that petitioner Mary Cardulla is not liable for the sec. 6653(b)↩ addition to tax for petitioners' 1973, 1974, and 1975 taxable years.
21. We note that these figures were taken directly from respondent's net worth calculations and will have to be adjusted to account for the exclusion of those custodial bank accounts held in trust by petitioners for their grandchildren and the depreciation allowance relating to the Cardullas' Mercedes Benz.↩
22. Estate of Steinberg v. Commissioner,T.C. Memo. 1965-244, affd. 367 F.2d 130↩ (2d Cir. 1966).
23. See Leeby v. Commissioner,T.C. Memo. 1956-118↩.
24. See also Bahoric v. Commissioner,363 F.2d 151 (9th Cir. 1966); Nadell v. Commissioner,T.C. Memo. 1974-227; Bollella v. Commissioner,T.C. Memo. 1965-162, affd. 374 F.2d 96 (6th Cir. 1967); Estate of Bernstein v. Commissioner,T.C. Memo. 1956-260, affd. 267 F.2d 879↩ (5th Cir. 1959).
25. Petitioners also asserted that Revenue Agent Zingaro in some way fabricated evidence. We find this claim to be malicious and wholly without merit. In addition, we find no merit in petitioners' allegation that respondent's investigators failed to fully record the various interviews with petitioners and other persons. Indeed, Revenue Agent Zingaro recorded these interviews in their entirety and copies of Mr. Zingaro's notes were subsequently placed into evidence at petitioners' own request. Finally, we find utterly absurd petitioners' contention that respondent in some manner orchestrated the absence of the Cardullas' accountant from the trial of the instant case.↩
26. Sec. 6013(e), as amended by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 494, 801, provides in pertinent part, as follows: (e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES. -- (1) IN GENERAL. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. (2) GROSSLY ERRONEOUS ITEMS. -- For purposes of this subsection, the term "grossly erroneous items" means, with respect to any spouse -- (A) any item of gross income attributable to such spouse which is omitted from gross income, and (B) any claim of a deduction, credit, or basis by such spouse in a amount for which there is no basis in fact or law. (3) SUBSTANTIAL UNDERSTATEMENT. -- For purposes of this subsection, the term "substantial understatement" means any understatement (as defined in section 6661(b)(2)(A)) which exceeds $500. The amendments in sec. 6013(e)↩ found in the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494 were made applicable to all cases pending at the time of their enactment.
27. A "substantial understatement" is defined in sec. 6013(e)(3) as any "understatement" which exceeds $500. Sec. 6661(b)(2)(A)↩ defines an "understatement" as the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax imposed which is actually shown on the return.
28. Prior to its 1984 amendment, sec. 6013(e)(1)(C)↩ specifically required that we make our determination as to whether it is inequitable to hold the "innocent spouse" liable for the deficiency by "taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income."
29. We note that sec. 1.6013-5(b), Income Tax Regs.↩, was promulgated prior to the effective date of sec. 424(a) of the Deficit Reduction Act of 1984, Pub. L. 98-369 98 Stat. 494, which removed the specific reference to a significant benefits determination.