DEMETRIOS VOTSIS AND HELEN VOTSIS, Petitioners v. COMMISSIONER OF INTERNAL REVNEUE, Respondent; CHRIS VOTSIS AND CHRISTINE VOTSIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Votsis v. Commissioner
Docket Nos. 23634-84; 23635-84.
United States Tax Court
T.C. Memo 1988-70; 1988 Tax Ct. Memo LEXIS 96; 55 T.C.M. (CCH) 175; T.C.M. (RIA) 88070; February 23, 1988. Michael H. Martella, for the petitioners. Jerome Warner, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: These cases were *98 assigned to Special Trial Judge Hu S. Vandervort pursuant to section 7456(d)(3) of the Code (redesignated section 7443A(b)(3) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rules 180, 181 and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE VANDERVORT, Special Trial Judge: In these consolidated cases, respondent determined deficiencies and additions to tax in petitioners' Federal income tax as follows: Additions to Tax
Petitioner
Year
Deficiency
Sec. 6653(b)
Demetrios and
1976
$ 2,762,12
$ 1,414.06
Helen Votsis 1977
6,697.20
3,348.60
(23634-84) 1978
4,335.51
2,167.76
1979
13,378.67
6,689.34
Chris and
1976
1,256.21
684.11
Christine Votsis 1977
3,543.05
1,828.53
(23635-84) 1978
6,333.04
3,166.52
1979
9,433.37
4,716.69
*99 The issues for decision are (1) whether petitioners received unreported income in amounts determined by respondent using the net worth method of income reconstruction; (2) whether any part of the underpayment of tax for each of the years in issue was due to fraud within the meaning of section 6653(b); and (3) whether petitioners Helen Votsis and Christine Votsis are each entitled to relief under the "innocent spouse" provisions of section 6013(e) for each of the years in issue. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioners filed their respective joint Federal income tax returns (Forms 1040) for the calendar years 1976, 1977, 1978 and 1979 with the Internal Revenue Service Center in Andover, Massachusetts. Petitioners all resided in Pittsford, New York, at the time their respective petitions were filed in these cases. Background
Petitioners Demetrios "Jim" Votsis and Chris Votsis are brothers who were born in Florina, Greece and moved to the United States with their family in 1963. The family arrived in this country with little or no money and lived in one side *100 of a house at 222 S. Woodland St. in Rochester, New York. Originally, seven Votsis family members lived in their side of the house, which included three bedrooms. At all relevant times, the mother, Elizabeth Votsis, was a houusewife; and the father, Apostolos Votsis, was the head of the house. After moving to this country, he supported the family by washing cars for five years, after which time he became a janitor. Neither Demetrios nor Chris Votsis received any formal education to speak of beyond the age of thirteen. Between 1963 and 1970, both men lived at home with the Votsis family, and each held various low-paying jobs, including employment at several restaurants. During the years in issue, each man maintained at least seven savings, checking, and/or certificate of deposit accounts either in their own name or in trust for a family member. They frequently traveled to Greece and, upon reentering this country, never declared to U.S. Customs any sums of money in their possession. They also engaged in several property transactions involving market rate mortgage loans. In 1970, Demetrios and Chris Votsis each got married while in Greece, returned with their wives to the United *101 States, and lived with the Votsis family at 222 S. Woodland St. In 1971, petitioner Demetrios Votsis purchased a house at 1154 Monroe Ave. in Rochester, New York. In connection with that purchase, he submitted a Mortgage Loan Application to the Rochester Savings Bank. In listing his assets on the application, dated July 15, 1971, he made no reference to cash. Petitioners' Restaurant Operations
On October 13, 1972, petitioners Demetrios and Chris Votsis formed a partnership, the West Wayne Plaza Restaurant, of which each man was a 50 percent partner. They operated the restaurant strictly on a cash basis and maintained both a checking account and a payroll account for the restaurant. At no time did either petitioner Helen Votsis or petitioner Christine Votsis work at the restaurant or become involved in the operations of the restaurant. The restaurant's bills were paid with cash from the restaurant's cash register, and Demetrios and Chris Votsis frequently took money from the cash register for their personal use. After the close of business each evening, Demetrios or Chris Votsis entered an amount purporting to be the restaurant's gross sales receipts for the day on a *102 "daily sheet." For payroll purposes, the number of hours worked by restaurant employees was orally reported to Charles Bastuk. Mr. Bastuk was an accountant who prepared the restaurant's and petitioners' tax returns for the years in issue, based solely on information provided by petitioners Demetrios and Chris Votsis. At the end of each month, Mr. Bastuk picked up both the daily sheets and a box containing invoices and receipts for business expenses incurred during the month. He was not given cash register tapes substantiating business receipts. He did not audit the daily sheets, but merely recapped the total amount shown on each sheet to arrive at yearly totals which were used in preparing petitioners' respective tax returns. Petitioners' Activities
In 1973, petitioners Helen and Christine Votsis each filed an Application to File Petition for Naturalization with the Immigration and Naturalization Service. Each application was accompanied by an Affidavit of Support by the wives' respective husbands. In their respective affidavits, Chris Votsis stated that he had "No assets," and Demetrios Votsis listed his assets while making no mention of any cash he may have accumulated. *103 On September 4, 1973, Chris Votsis purchased a house in Rochester, New York. On November 15, 1974, Demetrios Votsis went to the Marine Midland Bank in Rochester, New York, and exchanged 14,000 German marks and 16,000 Greek drachmas for approximately $ 7,000 in U.S. currency. On May 25, 1975, petitioners Demetrios and Chris Votsis submitted a single "STATEMENT OF FINANCES" to the State of New York Liquor Authority in connection with a liquor license application for the restaurant. The statement requires applicants to list all their assets and liabilities, whether or not related to their restaurant business. Accordingly, they listed the restaurant's assets and their personal assets, but did not indicate that they possessed any cash. The liabilities enumerated were each man's mortgage on his residence and a partnership chattel mortgage on certain restaurant equipment. On May 15, 1979, petitioner Demetrios Votsis applied for a charge account at Roth Bros. Manor House. The application required him to "list all credit lines, loans and accounts on which [he was] indebted," and showed the Rochester Savings Bank as the sole creditor. The attached financial statement enumerated *104 his assets and included no statement of cash he may have maintained at the time. On or about November 14, 1979, petitioner Chris Votsis purchased his Pittsford, New York residence. The entire $ 8,388.30 cash downpayment was made with proceeds from the sale of certain shares of his stock made approximately a week earlier. Attached to the mortgage loan application for the purchase of the residence, Chris and Christine Votsis each submitted a document titled "EMPLOYER'S VERIFICATION" for the purpose of confirming their employment at the restaurant. Both documents were signed as "employer" by Chris Votsis' cousin, Gus Patiras, who actually worked only sporadically at the restaurant, and never in the capacity as employer. Although Christine Votsis never worked at the restaurant, her employment verification document states that she was employed as a cashier and hostess, and lists amounts purporting to be her annual earnings. Respondent's Audit
In December 1980, Internal Revenue Special Agent John Garvin visited the restaurant and contacted Demetrios Votsis, who declined to speak with Mr. Garvin. Mr. Garvin subsequently requested both the complete books and records of the restaurant *105 and the specifics regarding petitioners' cash on hand and sources of income for the years in issue. Petitioners merely responded that Demetrios and Chris Votsis each received a dowry at or about the time of their respective weddings and accumulated earnings from prior years. When pressed for details, they replied that Demetrios Votsis received a dowry and a loan [2] from his father-in-law; that Chris Votsis received a dowry from his father-in-law; and that both petitioners received a $ 10,000 gift ($ 5,000 each) from their father. No mention was made at that time of any other gifts or loans. Concerning the *106 dowries, Mr. Garvin interviewed the alleged donors, both of whom were evasive and unspecific regarding various details of the alleged transfers. Mr. Garvin also interviewed Elizabeth Votsis regarding the supposed $ 10,000 gift from her husband to Demetrios and Chris Votsis. She gave conflicting stories about the specifics of the transfer. Nevertheless, respondent allowed $ 8,000 of the gift ($ 4,000 each). Because the restaurant operated on a cash basis, and Mr. Garvin was never provided with a complete set of the restaurant's books and records, he reconstructed petitioners' income for the years in issue by using the net worth plus expenditures method. Under this method, petitioners' respective net worths were determined as of December 31 of each year in issue and showed an increase during each year. These increases were then adjusted to account for nondeductible personal expenditures and nontaxable income. The net worth calculations were made based on Mr. Garvin's conclusion that petitioners had no cash on hand during any of the years in issue. The net worth computations, as they appear in petitioners' respective deficiency notices, are summarized as follows: SUMMARY OF NET WORTH -
DEMETRIOS AND HELEN VOTSIS
12/31/75
12/31/76
12/31/77
ASSETS
Cash in Banks  $ 21,902.97 $ 24,749.82 $ 46,361.71 Securities  9,091.34 9,091.34 14,401.34 Real Estate  42,030.00 43,840.00 43,840.00 Mortgage Receivable  --    --    --    Automobiles  4,200,00 8,752.92 8,752.92 Business Assets  23,971.22 25,719.56 24,375.35 TOTAL ASSETS     101,195.53 112,153.64 137,731.32 LIABILITIES
Security Trust Co.  225.34 --    --    Lincoln First Bank  696.52 --    --    Mortgages  23,204,96 21,106,20 18,868.96 Unrealized Gain  --    --    --    Central Trust Co.  7,579.23 4,317.87 648.36 Depreciation Reserve  7,896.18 11,535.33 15,267.37 TOTAL LIABILITIES     39,602.23 36,959.40 34,784.69 NET WORTH
61,593.30 75,194.24 102,946.63 LESS: Prior Year Net Worth
(61,593.30)
(75,194.24)
INCREASE IN NET WORTH
13,600.94 27,752.39 ADD: Federal Income Taxes Paid
546.86 887.92 ADD: Personal Expenditures
7,134.22 10,405.02 LESS: Dividend Exclusion
(100.00)
(100.00)
LESS: Capital Gain Deduction
--    --    LESS: Unreported Capital Gain
--    --    LESS: Refunds and Security Deposits
--    (16.00)
ADJUSTED GROSS INCOME
21,182.02 38,929.33 LESS: Itemized Deductions
(2,800.00)
-0-   LESS: Exemptions
(3,000.00)
(3,000.00)
CORRECTED TAXABLE INCOME
15,382.02 35,929.33 LESS: Reported Taxable Income
(1,444.79)
(7,622.85)
UNREPORTED TAXABLE INCOME
$ 13,937.23 $ 28,306.48 *107 12/31/78
12/31/79
ASSETS
Cash in Banks  $ 48,536.08 $ 24,265.94 Securities  14,401.34 14,401.34 Real Estate  68,818.00 110,309.60 Mortgage Receivable  --    32,082.96 Automobiles  8,752.92 8,752.92 Business Assets  24,313.74 25,316.23 TOTAL ASSETS     164,822.08 215,128.99 LIABILITIES
Security Trust Co  --    --    Lincoln First Bank  --    --    Mortgages  22,601.50 38,767.63 Unrealized Gain  --    7,228.74 Central Trust Co.  --    --    Depreciation Reserve  20,403.47 20,624.86 TOTAL LIABILITIES     43,004.97 66,621.23 NET WORTH
121,817.11 148,507.76 LESS: Prior Year Net Worth
(102,946.63)
(121,817.11)
INCREASE IN NET WORTH
18,870.48 26,690.65 ADD: Federal Income Taxes Paid
1,433.63 1,491.38 ADD: Personal Expenditures
8,226.32 30,121.69 LESS: Dividend Exclusion
(200.00)
(100.00)
LESS: Capital Gain Deduction
--    (1,072.22)
LESS: Unreported Capital Gain
--    (655.44)
LESS: Refunds and Security Deposits
(420.80)
(703.08)
ADJUSTED GROSS INCOME
27,909.63 55,772.98 LESS: Itemized Deductions
-0-    (2,718.64)
LESS: Exemptions
(3,000.00)
(5,000.00)
CORRECTED TAXABLE INCOME
24,909.63 48,054.34 LESS: Reported Taxable Income
(8,914.67)
(3,073.87)
UNREPORTED TAXABLE INCOME
$ 15,994.96 $ 44,980.47  *108 SUMMARY OF NET WORTH -
CHRIS AND CHRISTINE VOTSIS
12/31/75
12/31/76
12/31/77
ASSETS
Cash in Banks  $ 5,216.43
$ 5,905.78 $ 5,180.56 Securities  20,123.47
20,123.47 20,123.47 Real Estate  33,000.00
33,000.00 78,600.00 Automobiles  2,000.00
8,827.00 13,890.29 Business Assets  23,971.22
25,719.56 24,375.35 TOTAL ASSETS     84,311.12
93,575.81 142,169.67 LIABILITIES
GMAC  --   --    3,176.93 Mortgages  18,898.95
17,596.85 46,583.15 Central Trust Co.  7,579.23
4,317.87 648.36 Depreciation Reserve  7,631.13
10,115.88 14,207.77 TOTAL LIABILITIES     34,109.31
32,030.60 64,616,21 NET WORTH
50,201.81
61,545.21 77,553.46 LESS: Prior Year Net Worth
(50,201.81)
(61,545.21)
INCREASE IN NET WORTH
11,343.40 16,008.25 ADD: Federal Income Taxes Paid
546.86 882.92 ADD: Personal Expenditures
8,141.11 9,621.07 ADD: Non-Deductible Capital Loss
--    --    LESS: Dividend Exclusion
(100.00)
(100.00)
LESS: Refunds and Security Deposits
--    (256.84)
ADJUSTED GROSS INCOME
19,931.37 26,155.50 LESS: Itemized Deductions
(4,423.86)
(1,664.15)
LESS: Exemptions
(3,000.00)
(3,000.00)
CORRECTED TAXABLE INCOME
12,507.51 21,491.75 LESS: Reported Taxable Income
(2,997.55)
(6,411.10)
UNREPORTED TAXABLE INCOME
$ 9,509.96 15,080.15 *109 12/31/78
12/31/79
ASSETS
Cash in Banks  $ 22,245.71 2,952.24 Securities  20,123.47 10,937.75 Real Estate  78,600.00 192,059.06 Automobiles  20,034 20,034.30 Business Assets  24,313.74 25,316.23 TOTAL ASSETS     165,317.22 251,299.58 LIABILITIES
GMAC  --    --    Mortgages  42,887.63 90,893.51 Central Trust Co.  --    --    Depreciation Reserve  16,938.33 22,432.61 TOTAL LIABILITIES     59,825.96 113,326.12 NET WORTH
105,491.26 137,973.46 LESS: Prior Year Net Worth
(77,553.46)
(105,491.26)
INCREASE IN NET WORTH
27,937.80 32,482.20 ADD: Federal Income Taxes Paid
1,117.49 1.584.13 ADD: Personal Expenditures
10,521.63 10,640.43 ADD: Non-Deductible Capital Loss
--    398.71 LESS: Dividend Exclusion
(200.00)
(100.00)
LESS: Refunds and Security Deposits
(371.05)
(250.00)
ADJUSTED GROSS INCOME
39,005.87 44,755.47 LESS: Itemized Deductions
(1,792.42)
-0-    LESS: Exemptions
(3,750.00)
(5,000.00)
CORRECTED TAXABLE INCOME
33,463.45 39,755.47 LESS: Reported Taxable Income
(7,790.00)
(6,548.89)
UNREPORTED TAXABLE INCOME
$ 25,673.45 $ 33,206.58 *110 To support his contention that petitioners had no cash on hand as of December 31, 1975, respondent prepared a 13-year "available currency analysis" (covering the years 1963-1975) of funds which would have been available to petitioners. Respondent's computations are as follows: AVAILABLE CURRENCY ANALYSIS -
DEMETRIOS AND HELEN VOTSIS
Earnings in the years 1963-1970
$ 29,532.76 PLUS: Gross Income - 1971     $ 9,970.00 SUBTOTAL     39,502.76 LESS: F.I.C.A. Taxes Paid 1963-1971     (1,648.50)
Federal Income Taxes Paid 1968-1971           [3,677.76)
Personal Living Expenses - 1971           (3,620.00)
CURRENCY AVAILABLE - 12/31/71
30,556.30 PLUS: Gross Income - 1972     943.00 Gift from Apostolos Votsis           4,000.00 SUBTOTAL     35,499.00 LESS: Personal Living Expenses - 1972     (3,740.00)
Net Worth - 12/31/72           (12,900.00)
CURRENCY AVAILABLE - 12/31/72
18,859.50 PLUS: Adjusted Gross Income - 1973     7,172.43 SUBTOTAL     26,031.93 LESS: Personal Living Expenses - 1973     (4,080.00)
Net Worth Increase - 12/31/73           (19,004.75)
CURRENCY AVAILABLE - 12/31/73
2,947.18 PLUS: Adjusted Gross Income - 1974     8,965.92 SUBTOTAL     11,913.10 LESS: Personal Living Expenses - 1974     (7,318.00)
Net Worth Increase - 12/31/74           (12,948.86)
CURRENCY AVAILABLE - 12/31/74
(8,353.76)
PLUS: Adjusted Gross Income - 1975     8,415.00 SUBTOTAL     61.24 LESS: Personal Living Expenses - 1975     (7,318.00)
Net Worth Increase - 12/31/75           (16,739.69)
CURRENCY AVAILABLE - 12/31/75
(23,996.45)
*111 AVAILABLE CURRENCY ANALYSIS -
CHRIS AND CHRISTINE VOTSIS
Earnings in years 1963 through 1972 - Chris
$ 41,203.64 - Christine                                    2,437.86 PLUS: Gift from Apostolos Votsis     4,000.00 SUBTOTAL     47,641.50 LESS: F.I.C.A. Taxes Paid 1963-1972     (1,598.27)
Federal Income Taxes Paid 1963-1972           (2,881.07)
Personal Living Expenses - 1971           (2,860.00)
1972                                      (3,740.00)
Net Worth - 12/31/72           (8,244.50)
CURRENCY AVAILABLE - 12/31/72
28,317.66 PLUS: Adjusted Gross Income - 1973     7,704.44 SUBTOTAL     36,022.10 LESS: Personal Living Expenses - 1973     (4,740.00)
Net Worth Increase - 12/31/73           (17,971.63)
CURRENCY AVAILABLE - 12/31/73
13,310.47 PLUS: Adjusted Gross Income - 1974     7,956.45 SUBTOTAL     21,266.92 LESS: Personal Living Expenses - 1974     (7,318.00)
Net Worth Increase - 12/31/74           (15,491.55)
CURRENCY AVAILABLE - 12/31/74
(1,542.63)
PLUS: Adjusted Gross Income - 1975     8,504.61 SUBTOTAL     6,961.98 LESS: Personal Living Expenses - 1975     (7,318.00)
Net Worth Increase - 12/31/75     (8,494.13)
CURRENCY AVAILABLE - 12/31/75
(8,850.15)
*112 Guilty Pleas
On July 27, 1983, a Federal grand jury returned an eight-count indictment charging Demetrios and Chris Votsis with, inter alia, willfully attempting to evade and defeat Federal income taxes in violation of section 7201. [3] The indictment charged Demetrios Votsis for the years 1976, 1977, 1978 and 1979; and charged Chris Votsis for the years 1977, 1978 and 1979. On December 8, 1983, Demetrios Votsis pleaded guilty to the count of tax evasion concerning the year 1979, and Chris Votsis pleaded guilty to the tax evasion charge against him as to 1978. [4] Judgments pursuant to those pleas were entered, and each was fined $ 5,000. Subsequent Trips to Greece
*113 During a 1984 trip to Florina, Greece, petitioner Chris Votsis created back-dated "notes" to corroborate claims of prior loans to Demeterios Votsis and himself. The language in each note was identical, except for the names of the borrower and lender, the amount, and the date. On February 12, 1987, petitioner Demetrios Votsis made three withdrawals from a Marine Midland Bank account in the form of bank checks, each containing the notation "re: To repay loan" and made payable as follows: Payee
Amount
John Gogos
$ 18,000
Georgios Bardas
6,000
Petros Kostarelis
12,000
Demetrios Votsis took these three checks with him on a two-week trip to Greece, beginning February 14, 1987. Each check was endorsed and cancelled by the National Bank of Greece, Florina Branch. The endorsing signature of Petros Kostarelis on the back of the $ 12,000 check, however, does not match that signature on the corresponding back-dated note drawn up in 1984. OPINION Using the net worth plus expenditures method, respondent determined that petitioners failed to report substantial amounts of taxable income in each of the years before the Court. Respondent also determined *114 that petitioners' omissions of taxable income and resulting underpayments of tax are due to fraud and, accordingly, determined that petitioners are liable for the fraud addition to tax under section 6653(b). Petitioners challenge respondent's net worth determinations, deny the commission of fraud, and allege that petitioners Helen Votsis and Christine Votsis are not liable for any deficiencies pursuant to the innocent spouse provision of section 6013(e). A presumption of correctness attached to respondent's determinations of deficiencies, and petitioners bear the burden of showing by a preponderance of the evidence that those determinations are incorrect. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933); Rockwell v. Commissioner,512 F.2d 882, 885 (9th Cir. 1975), affg. a Memorandum Opinion of this Court, cert. denied 423 U.S. 1015 (1975). Respondent, however, has the burden of establishing fraud by clear and convincing evidence. Section 7454(a); Rule 142(b); Cefalu v. Commissioner,276 F.2d 122, 128 (5th Cir. 1960),affg. a Memorandum Opinion of this Court, *115 Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Stone v. Commissioner,56 T.C. 213, 220 (1971). We had ample opportunity to observe petitioners Demetrios and Chris Votsis on the witness stand and to appraise their testimony in light of other evidence. Notwithstanding their lack of formal education, they appear to be astute businessmen possessing significant experience in the restaurant business. As the following discussion reveals, however, their stories contain many contradictions, and their testimony convinces us that they have little regard for the truth. As a preliminary matter, we address both the back-dated notes which were executed in 1984 and the three 1987 bank checks offered as evidence of alleged prior loans. First, as to the notes, Demetrios and Chris Votsis claim to have received numerous loans between 1970 and 1978, none of which were reduced to writing at the time of the loan. During a trip to Greece in 1984, Chris Votsis executed a promissory note for each alleged loan on behalf of Demetrios Votsis and himself. Each note was back-dated to the date of the supposed loan. Only one "lender," Aneseies Tezias, testified at trial, *116 and he admitted that he was never made aware of the purpose of the note. [5] Contrary to the testimony of both Mr. Tezias and Demetrios Votsis that lenders each wrote the notes in their own words with no direction from petitioners, the substantive language in each note is identical. Additionally, Demetrios Votsis confessed to not even being present when the notes were executed. The circumstances under which the notes were drawn up raise more questions about their validity than they answer. As a result, we find that the notes offer no probative evidence that the related loans actually took place. Second, we similarly reject petitioners' contention that the three bank checks to John Gogos, Georgios Bardas and Petros Kostarelis, dated February 12, 1987, offer reliable evidence of repayment of prior loans to Demetrios Votsis. The loans were allegedly made in 1974, 1977 and 1978, respectively. Demetrios Votsis testified that the terms of the *117 loans allowed him to make payments of the principal if and when it was convenient for him to do so, rather than requiring repayment at a time certain. Interest was never discussed or requested; and, although amounts were included in the bank checks purportedly as interest, they were arbitrary amounts not determined by using a fixed rate over the time the alleged loans remained outstanding. No periodic payments of principal or interest were made during the 9 to 13 years between the time of the alleged loans and the alleged repayment in 1987. We question the timing of the repayments prior to trial, since Demetrios Votsis is well aware of the significance of establishing loans for the purpose of his net worth. Our skepticism is supported by the fact that the signature of Petros Kostarelis on his bank check does not match that on the corresponding back-dated note drawn up in 1984. Accordingly, we disregard these checks as having any probative value in establishing the existence of the claimed corresponding loans. We now turn to the issue of petitioners' deficiencies.
1. Deficiencies
The first issue is whether petitioners underreported their taxable income in 1976, 1977, *118 1978 and 1979 as determined by respondent. Petitioners failed to maintain a complete and adequate set of books and records as required by section 6001[6] with regard to their income producing activities during the years in issue. See section 1.6001-1(a), Income Tax Regs. The gross receipt figures appearing on petitioners' income tax returns were based in part on daily sheets prepared by Demetrios and Chris Votsis. They never provided their tax return preparer or respondent with cash register tapes and sales receipts generated daily at the restaurant -- the only documentation which would substantiate the reliability of the gross cash sales receipts set forth by petitioners on the daily sheets. See Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957), affg. a Memorandum Opinion of this Court. [7] Under such circumstances, the Commissioner is authorized by section 446 to reconstruct a taxpayer's income by applying a method that will clearly reflect income. Section 446(b). See Holland v. United States,348 U.S. 121, 130-132 (1954); *119 Campbell v. Guetersloh,287 F.2d 878, 880 (5th Cir. 1961); Davis v. Commissioner,239 F.2d 187, 189 (7th Cir. 1956), affg. a Memorandum Opinion of this Court. The use of the net worth method has long been an acceptable method of reconstructing income. Holland v. United States, supra;Cefalu v. Commissioner, supra;Davis v. Commissioner, supra;Lipsitz v. Commissioner,21 T.C. 917 (1954), affd. 220 F.2d 871 (4th Cir. 1955). Petitioners contend that respondent's calculations need to be adjusted to account for various nontaxable sources of funds such as loans, gifts, dowries, and accumulated cash. Petitioners bear the burden of proving any adjustments to the computations, *120 and if petitioners show that a part of respondent's computations are incorrect, it will neither destroy the presumption of correctness which attaches to the remainder of the computations nor invalidate the use of the net worth method. Marcello v. Commissioner,380 F.2d 494, 497 (5th Cir. 1967); Cefalu v. Commissioner, supra at 125; Harper v. Commissioner,54 T.C. 1121, 1129 (1970). Opening Net Worth
The first step under the net worth method of income reconstruction is to accurately and clearly determine an opening net worth by competent evidence. Holland v. United States, supra at 132. After careful consideration of the record as a whole, we are convinced that respondent has satisfied this essential condition. Petitioners content that respondent has not established their respective opening net worths with reasonable certainty and has grossly understated their cash on hand by failing to take into account the alleged receipt of the following nontaxable sources of funds: Petitioner
Source
Amount
Year
Nature
Demetrios Votsis
Stergios Nassis
$ 10,000
1970
dowry
Apostolos Votsis
5,000
1972
gift
John Gogos
15,000
1974
loan
Anthony Gogos
20,000
1974
loan
Stergios Nassis
7,000
1974
gift
Chris Votsis
Stavos Gatsis
25,000
1970
dowry
Aneseies Tezias
15,000
1970
loan
Cheryistolis Tavellaris
15,000
1971
loan
Constantine Gatsis
15,000
1971
loan
Apostolos Votsis
5,000
1972
gift
Constantine Tsabazis
15,000
1975
loan
*121 In addition, Demetrios and Chris Votsis also claim to have saved money while living with the Votsis family at 222 S. Woodland St. from 1963 until they each purchased their own homes in 1971 and 1973, respectively. However, with the exception of the two $ 5,000 gifts from Apostolos Votsis and the dowries, none of these sources of funds were mentioned during respondent's audit and investigation. We will address these alleged amounts chronologically. First, Demetrios Votsis' wife and in-laws testified at trial that Demetrios Votsis received a $ 10,000 dowry while in Greece for his 1970 wedding. We note, however, that this Court may discount a witness' self-interested testimony and is not required to accept any testimony at its face value, even if uncontroverted, if it is unreasonable, questionable, or inherently improbable. Quock Ting v. United States,140 U.S. 417 (1891); Fleischer v. Commissioner,403 F.2d 403, 406 (2d Cir. 1968), affg. a Memorandum Opinion of this Court; Weiss v. Commissioner,221 F.2d 152 (8th Cir. 1955), affg. a Memorandum Opinion of this Court; *122 Dougherty v. Commissioner,60 T.C. 917, 932-933 (1973). Demetrios Votsis' wife and mother-in-law admit to not being present when the dowry was allegedly given, and have no personal knowledge of the transfer. Although Stergios Nassis testified that he gave the dowry in a combination of Greek and U.S. currency, he was unable to give details such as the amount of each type of currency comprising the transfer. The testimony is inconsistent with the fact that no such money was declared to U.S. Customs upon Demetrios Votsis' subsequent reentry into this country in 1970. Moreover, Demetrios made no mention of this money on his July 15, 1971 mortgage loan application. If he in fact received a dowry, it was in his best interest in securing the mortgage loan to state the dowry as an asset on the application. Further, although a portion of the dowry allegedly consisted of Greek drachmas, the record contains no evidence of that portion being exchanged for U.S. currency for use in this country. When in Greece for his 1970 wedding, Chris Votsis allegedly received a $ 25,000 dowry from Stavos Gatsis and a $ 15,000 loan from Aneseies Tezias. As to the dowry, Stavos Gatsis did *123 not testify at trial, and we discount Chris Votsis' uncorroborated testimony as merely self-serving. See Quock Ting v. Commissioner, supra; Weiss v. Commissioner, supra.With regards to the alleged $ 15,000 loan, Aneseies Tezias offered confusing testimony as to when he gave the loan. When asked the reason given for needing the loan, Mr. Tezias offered the unlikely explanation that he gave the money simply because Chris Votsis asked for it, and he did not inquire as to the loan's purpose for fear of being impolite. We find the evidence of a dowry and loan to be suspicious, self-serving, and unbelievable; especially considering that no such sums were declared U.S. Customs by Chris Votsis upon entering this country in 1970, shortly after his marriage. Chris Votsis further maintains that, during a subsequent trip to Greece in 1971, he received loans from several friends, none of whom testified at trial. Receipt of such loans is contrary both to the fact that he declared no money to U.S. Customs upon reentering this country and to his claims of an already existing cash hoard of $ 40,000 (the $ 25,000 dowry and $ 15,000 loan, both discussed above). The evidence *124 of borrowing money indicates an absence, rather than the presence, of a large accumulation of cash. Thomas v. Commissioner,223 F.2d 83, 88 (6th Cir. 1955), revg. on other grounds a Memorandum Opinion of this Court. Accordingly, Chris Votsis has not established the existence of these 1971 loans to our satisfaction. In 1972, petitioners Demetrios and Chris Votsis allegedly received $ 5,000 each from their father towards opening the restaurant. Their mother testified on behalf of their late father, but she had no first-hand personal knowledge of the transfer. Additionally, neither Demetrios nor Chris Votsis made any mention of accumulated cash in their respective Affidavits of Support attached to their wives' 1973 petitions for naturalization. If petitioners in fact enjoyed the cash hoard they claim to have possessed, it was in their best interest to disclose that fact on the affidavits in order to assure that their wives would be provided for and would "not become public charges" after being naturalized as U.S. citizens. Nevertheless, respondent allowed Demetrios and Chris Votsis $ 4,000 of the $ 5,000 each claimed as a gift. Respondent's concession seems *125 to be extremely generous, and we find no basis upon which to allow any additional amounts. In 1974, Demetrios Votsis allegedly received a $ 15,000 loan in Greece from John Gogos, a $ 20,000 loan in Greece from Anthony Gogos, and a gift from his father-in-law equal to approximately $ 7,000 worth of German marks and Greek drachmas. First, Demetrios Votsis offered no reasonable explanation as to why, if he actually possessed these sums, he did not claim the loans as liabilities and the gift as an asset on his May 25, 1975 Statement of Finances submitted to the New York Liquor Authority. Second, as to the two loans, neither "lender" testified at trial, and no such loan proceeds were declared to U.S. Customs upon his reentry into this country in 1974. Third, concerning the gift from his father-in-law, Demetrios Votsis presented a bank currency exchange statement which convinces us that he actually received the $ 7,000 gift. Thus, respondent's opening net worth computations shall be adjusted accordingly. Next, Chris Votsis claims to have received a $ 15,000 loan in 1975 from Constantine Tsabazis, who did not testify at trial. As with Demetrios Votsis, Chris Votsis did not reveal *126 this or other alleged loans or gifts on his Statement of Finances submitted to the New York State Liquor Authority, even though the statement requires disclosure of all assets and liabilities whether or not related to petitioners' restaurant business. Accordingly, he has not carried his burden of showing receipt of the 1975 loan. Our suspicions that Chris Votsis never received any of the claimed loans were confirmed by his confused testimony. He offered no reasonable explanation for failing to disclose the alleged loans on the liquor license application. When asked why he needed the loans, he responded "Well, just loans that were to purchase different, you know, like investment, you know. Because they had the money there. They were an investment, you know, they were afraid. I don't know." Finally, we are persuaded that any cash which petitioners may have accumulated during or before 1973 while living with the Votsis family at 222 S. Woodland St. was consumed prior to 1976. Petitioners offer no evidence as to specific amounts of money allegedly saved, and it strains credulity to argue that they were able to accumulate any significant sums of money. The Votsis family came *127 to this country with little or no money and lived in only one side of a house. The women did not work, and the father supported the entire family from his income as a car washer and a janitor. Demetrios and Chris Votsis both contributed to some extent out of their earnings from various low-paying jobs. Therefore, we are not convinced that they possessed in 1976 any money they may have saved during or before 1973. To summarize, we will allow an adjustment in respondent's opening net worth computations to account for the receipt by Demetrios Votsis of a $ 7,000 gift from his father-in-law in 1974. However, this adjustment still results in available currency for Demetrios Votsis of -$ 16,996.45 as of December 31, 1975 (-$ 23,996.45 plus the adjustment of $ 7,000). [8] Consequently, respondent was justified in calculating petitioners' opening net worths based on zero cash on hand as of December 31, 1975, and petitioners have failed to show respondent's opening net worth determinations to be inaccurate. Unreported Taxable Income
Petitioners further argue that respondent erroneously calculated *128 their respective unreported taxable income for the years in issue by failing to account for the alleged receipt of the following nontaxable sources of funds during those years: Petitioner
Source
Amount
Year
Nature
Demetrios Votsis
Georgios Bardas
$ 5,000 1977
loan
Nicholas Gogos
18,000
1977
loan
Petros Kostarelis
10,000
1978
loan
Apostolos Votsis
14,000
1979
gift
Chris Votsis
Stavos Gatsis
15,000
1979
gift
Apostolos Votsis
10,000
1979
gift
We will address each in turn. Demetrios and Chris Votsis contend that they each had a small box hidden at their home in which they kept this money. At trial, however, neither could testify as to the amounts allegedly contained in their cash hoards or to specific amounts dedicated to particular uses during any of the years in issue. Petitioner Demetrios Votsis claims to have received two loans in 1977 while in Greece, and one loan in 1978. These claims of needing money are inconsistent with his claims of possessing a $ 57,000 cash hoard by this time. See *129 Thomas v. Commissioner, supra. We also find it curious that he at no time revealed the purpose for which these alleged loans were received. We are additionally suspicious of the fact that he did not declare to U.S. Customs any loan proceeds supposedly received in Greece and brought into this country in 1977. Accordingly, he has not carried his burden of proof as to these loans. Demetrios Votsis also maintains that he received a $ 14,000 gift from his father in 1979. We reject this claim as uncorroborated by any documentary evidence and inconsistent with the fact that Demetrios Votsis did not mention such amounts on his 1979 financial statement attached to a Roth Bros. Manor House charge account application. Similarly, Chris Votsis claims to have received in 1979 gifts of $ 15,000 from his father-in-law and $ 10,000 from his father. However, Chris Votsis' self-serving testimony as to these transfers is uncorroborated and unbelievable. First, in connection with a 1979 mortgage loan application, Chris and Christine Votsis each submitted an "EMPLOYER'S VERIFICATION" in which they knowingly gave false statements that Christine Votsis was employed at the restaurant. *130 Additionally, both documents were improperly signed as "employer" by Chris Votsis' cousin, who only occasionally worked at the restaurant as an employee. [9] Chris Votsis testified that these misrepresentations were necessary to obtain the loan. It is inconceivable that he felt he had to make false and misleading statements in order to convince the bank that he was worthy of a loan while, at the same time, excluding any mention of $ 25,000 in cash he allegedly possessed at the time. Second, the $ 10,000 gift from his father was supposedly given for Chris Votsis to use towards buying a house. He did purchase a house on or about November 14, 1979; however, the entire $ 8,388.30 downpayment was made with proceeds of a previous stock sale. He would not have had to sell his stock to make the downpayment if he actually received the $ 10,000 gift for that purpose. Such representations are evidence of an attempt to mislead respondent and this Court. The record contains no credible explanation of why either Demetrios or Chris Votsis *131 would keep a large cash hoard. The schedule of bank accounts that each maintained and the schedule of property transactions and borrowings each engaged in show them to be persons who invested extensively in property and who were not mistrustful of banks. Indeed, each placed substantial sums of money in interest-bearing accounts and borrowed substantial sums at market interest rates. [10]
We disagree with petitioners' contention that respondent ignored information of the alleged sources of funds. The Government is required either to prove a likely source of taxable income or to track down relevant leads of nontaxable sources of income furnished by the taxpayer. United States v. Massei,355 U.S. 595 (1958); Holland v. United States, supra at 135-138. At no time during the audit or investigation stages did petitioners identify or provide details regarding the majority of nontaxable income sources they have since claimed at trial. The only leads provided were thoroughly investigated and convincingly negated. *132 Nevertheless, a strong inference that the restaurant's gross receipts represent the primary source of petitioners' unreported income is created from the fact that petitioners freely took money from the restaurant cash register, operated the business exclusively on a cash basis, and failed to keep adequate books and records from which the restaurant's gross receipts could be verified. Thus, although not required to do both, respondent has negated all possible sources of nontaxable income and has established a likely source of petitioners' unreported income. [11]
In sum, we are convinced that petitioners received no nontaxable income which accounts for the increases in their respective net worths as determined by respondent. Petitioners have failed to carry their burden of demonstrating error in respondent's determination of their respective unreported income for the years in issue.
2. Civil Fraud
We now consider whether part of the underpayment of tax required to be shown on petitioner's Federal income tax returns for their taxable years 1976, 1977, 1978 and 1979 was due to fraud. *133 Section 6653(b) imposes an addition to tax if any part of an underpayment of tax is due to fraud. Respondent must show that the taxpayer intended to evade taxes which the taxpayer knew or believed to be owing by conduct intended to conceal, mislead, or otherwise prevent collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner, supra at 1123; McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). Respondent must establish (1) an underpayment of tax, [12] and (2) that some part of the underpayment was due to fraud. Plunkett v. Commissioner,465 F.2d 299, 301 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Respondent has established by clear and convincing evidence that petitioners had underpayments in each of the years in issue. The determinative *134 issue, therefore, is whether part of the underpayment in each of the years in issue was due to fraud. The existence of fraud is a question of fact to be determined on the basis of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), cert. denied 379 U.S. 827 (1964), affg. 37 T.C. 703 (1962); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977). Respondent may carry his burden of proving fraud on the basis of reasonable inferences to be drawn from the record, but may not rely on petitioners' failure to carry their burden of proof as to the underlying deficiency. Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982). Because direct proof of fraudulent intent is seldom available, respondent may show the requisite intent from the surrounding circumstances and petitioners' entire course of conduct. Grosshandler v. Commissioner,75 T.C. 1, 19 (1980); Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978); *135 Stone v. Commissioner, supra at 223-224. A taxpayer criminally convicted under section 7201, even by virtue of a guilty plea, is collaterally estopped from denying fraud for purposes of section 6653(b) in a civil tax case involving the same years. Kercheval v. United States,274 U.S. 220, 223 (1927); Plunkett v. Commissioner,465 F.2d at 305; Rodney v. Commissioner,53 T.C. 287 (1969); Otsuki v. Commissioner, supra;Arctic Ice Cream Co. v. Commissioner,43 T.C. 68, 75 (1964). Thus, Demetrios and Chris Votsis' pleas of guilty under section 7201 for the years 1979 and 1978, respectively, collaterally estop them from denying civil fraud in those years. Both men claim to have made the pleas under economic duress, but the voluntariness of one's guilty plea is not vitiated where they understand the terms and immediate consequences of the plea. United States v. Carlino,400 F.2d 56 (2d Cir. 1968); Cortez v. United States,337 F.2d 699 (9th Cir. 1964), cert. denied *136 381 U.S. 953 (1965). See also United States v. Follette,395 F.2d 721 (2d Cir. 1968). Moreover, we refuse to engage in an examination of the voluntariness of petitioners' please in this proceeding where they have not directly appealed the conviction in their criminal cases. Plunkett v. Commissioner,465 F.2d at 307. [13]
The consistent and substantial understatement of income is strong evidence of fraud. Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980); Otsuki v. Commissioner, supra at 107-108. Respondent's computations clearly reveal petitioners' pattern of substantially understating income during each year in issue. Fraud is further evidence by petitioners' extensive dealings in cash, failure to keep adequate books and records, and failure to supply complete information about their income and expenses to their tax return preparer. *137 Korecky v. Commissioner,781 F.2d 1566, 1568 (11th Cir. 1986), affg. per curiam a Memorandum Opinion of this Court; Gromacki v. Commissioner,361 F.2d 727 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121, 1141 (1970); Otsuki v. Commissioner, supra at 110. In the present cases, the restaurant's operations were conducted exclusively on a cash basis. Petitioners maintained no original records of income (i.e., cash register tapes) or payroll expenses. Rather, the restaurant's gross receipts were based on daily sheets prepared by Demetrios and Chris Votsis, and restaurant employees' hours were orally reported to the tax return preparer. This information was inadequate to accurately appraise the return preparer of the full amount of petitioners' income. Petitioners' false statements (including misleading omissions) and implausible or inconsistent explanations of behavior are also indicia of fraud. *138 Bradford v. Commissioner,796 F.2d 303 (9th Cir. 1986), 468 F.2d 791, 794 (5th Cir. 1972); Grosshandler v. Commissioner, supra at 20. Petitioners made misleading statements to respondent's agents, and gave testimony which contradicted documentary evidence. Additionally, the majority of specific cash hoard claims were presented for the first time at trial and were unsupported by documentary evidence. The circumstances of these cases, together with petitioners' conduct, convincingly expose their fraudulent intent. See Holland v. United States, supra. Accordingly, we find that respondent has carried his burden of proving fraud, and that petitioners Demetrios Votsis and Chris Votsis are liable for the additions to tax pursuant to section 6653(b) for each year in issue. We also find that respondent has failed to carry his burden of proving fraud as to petitioners Helen Votsis and Christine Votsis.
3. Innocent Spouse Relief
Next, we deal with whether petitioners Helen Votsis and Christine Votsis each qualify for relief from liability under the innocent spouse provision of section 6013(e). *139 [14]The liability from which an innocent spouse is relieved includes "interest, penalties, and other amounts." Section 6013(e)(1). Each spouse claiming absolution has the burden of proving that all four statutory prerequisites of section 6013(e) have been satisfied. Rule 142(a); Lessinger v. Commissioner,85 T.C. 824, 838 (1985); Sonnenborn v. Commissioner,57 T.C. 373, 381-383 (1971). The first requirement is that a joint return must be made for each of the taxable years in issue. Section 6013(e)(1)(A). In the instant cases, petitioners filed their respective joint Federal income tax returns in all four of the years in question. *140 Second, there must be a "substantial understatement of tax attributable to grossly erroneous items of one spouse." Section 6013(e)(1)(B). [15]Section 6013(e)(2) defines the term "grossly erroneous items" to mean, with respect to any spouse, "any item of gross income attributable to such spouse which is omitted from gross income" and "any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law." Respondent does not contend that the understatements of tax in these cases are attributable to other than unreported income. Based on the entire record, we are satisfied that petitioners Demetrios and Chris Votsis exercised exclusive control over the restaurant, which was the primary source of unreported income in the present cases. Because the omitted income is attributable to these two men, and because we find that the omitted amounts constitute a "substantial understatement," petitioners Helen and Christine Votsis have satisfied the requirement of section 6013(e)(1)(B). *141 Third, the spouses seeking relief must establish that "in signing the joint returns [they] did not know, and had no reason to know that there was such substantial understatement." Section 6013(e)(1)(C). Helen and Christine Votsis each "must establish that a reasonably prudent taxpayer, with [their] knowledge of the family finances, would have no reason to know of the omission." Estate of Jackson v. Commissioner,72 T.C. 356, 361 (1979). Neither woman participated in any operations of the restaurant. Both were uneducated and relied totally on their husbands to handle family finances. When each woman signed their respective joint returns, they logically, although mistakenly, presumed the returns were properly completed. We believe, therefore, that neither wife knew or had reason to know of omitted income for any of the years in issue. Finally, we must determine whether, taking into consideration all of the facts, it is inequitable to hold Helen or Christine Votsis liable for the deficiencies in tax for the years in issue. Section 6013(e)(1)(D). Although petitioners' standard of living increased after the restaurant was opened, Helen and Christine Votsis *142 actually benefited relatively little from this increase. They rarely went out to dine, dance, or see a show; and the only money they personally possessed was that requested of, and given to them by, their husbands. Even though some bank accounts were in the wives' names and certain other assets were held jointly with their respective husbands, these assets were controlled by their husbands. The only benefits received by petitioners Helen and Christine Votsis were in the nature of ordinary family support, which is not a sufficient basis upon which to support a finding of significant benefit. Terzian v. Commissioner,72 T.C. 1164, 1172-1173 (1979); Mysse v. Commissioner,57 T.C. 680, 698-699 (1972). We do not believe that the incidental benefits enjoyed by the women are sufficient for this Court to impose liability in the instant cases. Therefore, we conclude that petitioners Helen and Christine Votsis have each sustained their burden of proving themselves entitled to the relief afforded to an innocent spouse pursuant to section 6013(e). To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise noted. ↩
2. This alleged loan refers to a $ 7,000 check dated January 1980 and given by Stergios Nassis to Demetrios Votsis. Although the transfer is claimed to be a loan to Demetrios Votsis, the check contains a notation indicating the purpose of the transfer was "To repay loan" from Demetrios Votsis to Stergios Nassis. Mr. Nassis testified at trial that the notation was made so others would not know of the loan to Demetrios Votsis. Regardless of the inconsistencies, we need not consider the effect of this transfer since it was made in 1980 and is beyond the years in issue. ↩
3. SEC. 7201. ATTEMPT TO EVADE OR DEFEAT TAX. Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $ 10,000 * * * or imprisoned not more than 5 years, or both, together with the costs of prosecution. ↩
4. The record does not reflect the disposition of the remaining counts charged in the indictment. ↩
5. Concerning the note for his alleged loan to Chris Votsis, Mr. Tezias testified, in part, as follows: Q: Was there any reason given why, from Chris [Votsis], that you had to sign the [promissory note]? A: No. We didn't discuss. ↩
6. Section 6001 provides in pertinent part as follows: Every person liable for any tax imposed by this title, or for the collection therof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe. * * * ↩
7. See also Catalanotto v. Commissioner,T.C. Memo. 1984-215↩. 8. See respondent's "Available Currency Analysis" in our Findings of Fact. ↩
9. Chris Votsis testified that he told his cousin to "just sign [the employer's verifications] on the bottom, you know, pretend you're the manager." ↩
10. See Catalanotto v. Commissioner,T.C. Memo. 1984-215↩. 11. See Cardulla v. Commissioner,T.C. Memo. 1986-307↩. 12. As relevant to these cases, section 6653(c)(1) defines the term "underpayment" for purposes of section 6653 as a "deficiency" defined under section 6211↩. 13. See also Plunkett v. Commissioner,T.C. Memo. 1970-274↩. 14. Section 6013(e), as amended by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 494, 801-802 (1984-3 C.B. (Vol. 1) 309-310), provides in pertinent part as follows: (e) Spouse Relieved or Liability in Certain Cases. -- (1) In general. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. (2) Grossly erroneous items. -- For purposes of this subsection, the term "grossly erroneous items" means, with respect to any spouse -- (A) any item of gross income attributable to such spouse which is omitted from gross income, and (B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law. (3) Substantial understatement. -- For purposes of this subsection, the term "substantial understatement" means any understatement (as defined in section 6661(b)(2)(A)↩) which exceeds $ 500. 15. A "substantial understatement" is defined in section 6013(e)(3) as any "understatement" which exceeds $ 500. Section 6661(b)(2)(A)↩ defines an "understatement" as the excess amount of tax required to be shown on the return for the taxable year over the amount of tax imposed which is actually shown on the return.